MAX FEINGOLD AND GERTRUDE FEINGOLD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6992-65.    Filed February 7, 1968.

*Noah Seedman*, for the petitioners.
*Agatha J. Vorsanger*, for the respondent.

462

OPINION

The issue in this case is whether net operating losses sustained by Germac during the years 1961 and 1962 are deductible from the income of its shareholders, the petitioners, under section 1374. Under

that section, the shareholders of an electing small business corporation are allowed to deduct the losses of the corporation. Since Germac made a timely election under section 1372 to be taxed as a small business corporation under subchapter S, the only question is whether that election terminated under section 1372(e)(5) because 100 percent of the corporation's receipts in 1961 and more than 99 percent of its receipts in 1962 were derived from the rental of vacation bungalows.

Section 1372(e)(5), as applicable to the years in controversy, provided:

SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

   (e) TERMINATION.—

      \*        \*        \*        \*        \*        \*        \*

    (5) PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporations has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.[2]

The purpose of this provision has been defined as follows:

When the "passthrough" type of tax treatment was provided for corporations, Congress decided to limit the availability of this treatment to small businesses *actively engaged in trades or businesses*. Therefore, it denied this treatment to corporations with large amounts of *passive income.* \* \* \* [Emphasis added. S. Rept. No. 1007, 89th Cong., 2d Sess., p. 8 (1966), 1966–1 C.B. 532; H. Rept. No. 1238, 89th Cong., 2d Sess., p. 8 (1966).]

---

  [2] In 1966, this paragraph was amended to read as follows :

  (5) PASSIVE INVESTMENT INCOME.—

    (A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

    (B) Subparagraph (A) shall not apply with respect to a taxable year in which a small business corporation has gross receipts more than 20 percent of which is passive investment income, if—

      (i) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year ; and

      (ii) the amount of passive investment income for such taxable year is less than $3,000.

    (C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom).

  [Act of Apr. 14, 1966, Pub. L. 89–389, 80 Stat. 114–115]

See S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 527, 532–533 ; H. Rept. No. 1238, 89th Cong., 2d Sess., p. 8 (1966), for an explanation of the purpose of this change.

Shortly after the enactment of subchapter S, the question arose whether section 1372(e)(5) would prevent a corporation engaged in the operation of a hotel or motel, where the major source of receipts was "rent" paid by guests for their rooms, from making an effective subchapter S election. This question was answered by section 1.1372–4 (b)(5)(iv), Income Tax Regs., which provides:

(iv) *Rents.* The term "rents" as used in section 1372(e)(5) means amounts received for the use of, or right to use, property (whether real or personal) of the corporation, whether or not such amounts constitute 50 percent or more of the gross income of the corporation for the taxable year. The term "rents" does not include payments for the use or occupancy of rooms or other space where significant services are also rendered to the occupant, such as for the use or occupancy of rooms or other quarters in hotels, boarding houses, or apartment houses furnishing hotel services, or in tourist homes, motor courts, or motels. Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only. The supplying of maid service, for example, constitutes such services; whereas the furnishing of heat and light, the cleaning of public entrances, exits, stairways and lobbies, the collection of trash, etc., are not considered as services rendered to the occupant. Payments for the use or occupancy of entire private residences or living quarters in duplex or multiple housing units, of offices in an office building, etc., are generally "rents" under section 1372(e)(5). Payments for the parking of automobiles ordinarily do not constitute rents. Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments.

In this case, no issue has been raised as to the correctness or validity of the regulations. The case turns on how they are to be interpreted and applied.

Germac's receipts indisputably arose from tenants' payments for the use of or right to use its property—the bungalows, the furniture, and the common recreation area. However, the petitioners contend that such receipts are not rents within the regulations because Germac rendered significant services which were primarily for the convenience of its tenants and which were other than those usually rendered in connection with the rental of space for occupancy only.[3] In support of this contention, the petitioners state that Germac provided the following services: It provided furniture for the bungalows and a recreation area maintained by the corporation, as well as tables and cards for use in that area; it sponsored bingo games for the adults and parties for the children at which small prizes were given; and it sponsored parties for the adults, providing food and entertainment.

[3] The proper interpretation of "rents" as used in the statute and regulations is a case of first impression. The respondent has, however, published several statements of his position in the form of Revenue rulings. See Rev. Rul. 65–91, 1965–1 C.B. 431; Rev. Rul. 65–83, 1965–1 C.B. 430; Rev. Rul. 65–40, 1965–1 C.B. 429; Rev. Rul. 64–232, 1964–2 C.B. 334; Rev. Rul. 61–112, 1961–1 C.B. 399.

We have found that Germac did provide furniture, a patio, and some recreational equipment for its tenants' use, but we do not believe that this constitutes the providing of services within the meaning of the regulations, significant or otherwise. Insofar as the corporation simply offered its tenants the right to use its property, payment by the tenant for that right constituted "rent" in its classic form and as specifically defined in the regulations. There was no proof that Germac rendered any services at all to the tenants in connection with the use of the furniture or recreation equipment. As to the patio, the only evidence of corporate activity in connection therewith was that the corporation paid the light bill and taxes for the patio area. Such activity does not constitute the performance of services to the occupant within the meaning of the regulations. We need not therefore determine whether such activity would fulfill the requirement of "significance."

The petitioners rely primarily upon their contention that Germac provided recreation and entertainment to the tenants. The petitioners point to Max's testimony that the corporation held bingo games for the adults and gave small parties for the children. We find this evidence unsatisfactory to sustain the petitioners' contention. Although uncontradicted, the testimony was unsupported by any documentary evidence, and it was completely unexplained. There was no attempt to show how many such games and parties were given in 1961 and 1962, or any other year; no indication as to what the corporation or its officers did to promote or supervise these activities except for the testimony that "we run games" and "run the parties"; no showing as to whether such activities were a significant part of the tenants' activities in terms of time, effort, or enjoyment, or were a significant part of the corporation's operations in terms of money or employee's efforts. Indeed, the tense in which the question eliciting this testimony was asked and answered at trial suggests that Max may have been testifying as to the corporation's activities and practices at the time of the hearing rather than during the years in controversy. In short, although the testimony supports our bare finding that bingo games and childrens' parties did take place, it does not enable us to find that these activities constituted significant services rendered by the corporation to its tenants.

The petitioners also contend that Germac gave or sponsored weekend parties for the adults. Most of the evidence at trial concerned this contention, but it was all vague, and often contradictory, as to the number of parties given during the taxable years in controversy, the nature of those parties, and the entertainment provided. The record shows little evidence as to the role played by the corporation in sponsoring these parties and is completely silent as to the degree or nature

of the participation by the tenants. Thus, when Max testified that six or seven parties were given during each summer, the respondent introduced into evidence for purposes of impeachment, without objection from the petitioners, an affidavit signed by Max and Gertrude Feingold on November 4, 1966, which had been submitted to the Internal Revenue Service in an effort to settle this case. According to that affidavit, only two or three parties were given each year. The petitioners did not attempt to explain away this affidavit, although it flatly contradicts Max's testimony. We therefore have found that the corporation gave no more than two or three parties during each of the taxable years in controversy, rather than the six or seven claimed, but that it did sponsor those two or three parties.

We have also found that the corporation provided approximately $25 in cash or $25 worth of food and beverages for each of these parties. The testimony on this issue was also vague, but we base our finding as to the amount on two checks for $25 drawn by Germac, introduced in evidence, which, Max testified without contradiction, were given to tenants on separate occasions to use to buy refreshments at parties.

We find the petitioners' claim that Germac provided entertainment at the parties, either a square dance caller or a small band, to be unsupported by the evidence. Although Max testified that Bill Lemkin was hired on occasion at $40 per evening to call square dances, and identified two checks for $40 each made out to Lemkin as having been given for such services, Germac's cash ledger shows these checks to have been drawn for repairs. The petitioners did not explain or attempt to explain why the corporate records showed the expenditures to have been made for repairs, rather than entertainment. In view of the general vagueness and inconsistencies of Max's testimony, we must give greater relative weight here to the documentary evidence. Therefore, despite our reluctance to disbelieve altogether the assertion that a square dance caller was hired for some of the parties during the years in controversy, we are presented with no reliable evidence on which to make a finding to that effect.

We find the claim that the corporation hired a small band to play for the parties on occasion during 1961 and 1962 to be completely unsupported. Max could name only one musician hired for this purpose, and on cross-examination, it appeared that the person thus named must have played, if at all, in years after the taxable years in controversy. As there was no other evidence on this issue, the contention is not proved.

In summary, we conlude that the total services provided by Germac do not constitute significant services within the meaning of the regula-

tions. In applying the tests in the regulations, we are concerned only with those services which are not customarily furnished to tenants for occupancy only. Since the evidence concerning the bingo games and children's parties was insufficient to allow us to make a finding as to their significance, the petitioners' position is reduced to a claim that corporate sponsorship of two or three parties during each of the years in question for the adult tenants, for each of which the corporation, or its principal officer Max, expended $25, constitutes "significant services." However, there is no showing that such activity was significant in any sense. It was not, so far as the record shows, an important factor in inducing tenants to rent the bungalows, or in improving their vacation while they stayed; indeed, there was no evidence whatsoever as to how many tenants participated in the parties. Nor was the corporation's activity in this regard shown to be a significant part of the corporation's activity. Financially, the proved expenditures of, at most, $75 per year on such activity, was approximately 0.15 percent of Germac's receipts in each year in controversy. There was no showing that the corporation was involved in the parties in any way other than notifying the tenants that a party was to take place and supplying a small amount of cash or refreshments, and the evidence strongly suggests that there was no other involvement. Therefore, the "services" did not represent in any way a significant part of the corporation's operations.

The regulations include no standard for interpreting the term "significant," except as can be inferred from the examples contained therein. Clearly, the services supplied by Germac were not comparable to the services furnished by the operator of a hotel or motel. In those businesses, guests come and go frequently, and maids service the rooms daily. From what appears of record in this case, the occupants of the bungalows neither required nor received any such frequent or extensive services. By any test of "significance," no significant services were rendered by Germac to the tenants other than those usually rendered in conection with the rental of space or other property for occupancy only, and its income from the bungalows was "rent" within the meaning of section 1.1372–4(b) (5) (iv), Income Tax Regs.

Since more than 20 percent of Germac's gross receipts in 1961 were such "rents," Germac's election was therefore terminated for that taxable year and subsequent taxable years under section 1372(e) (5). Consequently, its shareholders may not deduct Germac's loss from their individual income on their returns for 1961 and 1962. Our holding makes it unnecessary to consider the respondent's alternative contention that the loss suffered by Germac in 1962 was less than that claimed by the petitioners on their return for 1962.

*Decision will be entered for the respondent.*