BUHLER MORTGAGE COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2954–67. Filed March 17, 1969.

*Cyrus A. Johnson*, for the petitioner.
*Martin A. Schainbaum*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's Federal income taxes for the fiscal years ended October 31, 1964 and 1965, in the amounts of $20,716.52, and $30,182.19, respectively. Petitioner has conceded one of the issues, consequently the only issue remaining for consideration is whether petitioner's subchapter S status terminated by virtue of its section 1372(e)(5)[1] income being

---

[1] Internal Revenue Code of 1954. All references are to the Internal Revenue Code of 1954 unless otherwise stated.

greater than 20 percent of its gross receipts. Resolution of this issue is dependent upon whether receipts from sales of certain notes secured by deeds of trust are to be considered as a part of petitioner's gross receipts.

### FINDINGS OF FACT

Most of the facts have been stipulated and they are so found.

Petitioner, Buhler Mortgage Co. (hereinafter sometimes referred to as Buhler or petitioner) was, at all relevant times, a California corporation with its principal office in Sacramento, Calif. Pursuant to section 1372(a) of the Code, petitioner made a proper election to be taxed under subchapter S of the Code beginning with the taxable year ended October 31, 1959. Using an accrual method of accounting, it filed its U.S. Small Business Corporation Return of Income (Form 1120–S) for the years ended October 31, 1964, and 1965, with the district director of internal revenue at San Francisco, Calif.

Petitioner is presently and was at all relevant times engaged in the mortgage business in the Metropolitan Sacramento, Calif., area. As one of its activities during the years in issue petitioner operated under agreements with Bankers Life Co. of Des Moines, Iowa (Bankers), and Acacia Mutual Life Insurance Co. of Washington, D.C. (Acacia). Pursuant to these agreements petitioner obtained deed-of-trust notes secured by deeds of trust typical to the one reproduced below and sold them to the above companies:

### DEED OF TRUST NOTE

$18,300.00

SACRAMENTO, CALIFORNIA, *September 10, 1964*

FOR VALUE RECEIVED, the undersigned promise(s) to pay to BUHLER MORTGAGE COMPANY, INC. or order, at the office of Said Corporation at Sacramento, California, or at such other place as the holder hereof may designate in writing, the principal sum of EIGHTEEN THOUSAND THREE HUNDRED AND NO/100 Dollars ($18,300.00) with interest from date at the rate of Five and one-quarter per centum (5¼%) per annum on the balance remaining from time to time unpaid. Principal and interest shall be due and payable in monthly installments of One Hundred One and 20/100 Dollars ($101.20) commencing on the first day of November, 1964, and on the first day of each month thereafter until the principal and interest are fully paid, except that the final payment of principal and interest, if not sooner paid, shall be due and payable on the first day of October, 1994.

If default be made in the payment of any installment under this note and such installment be not paid prior to the due date of the next such installment, or in any of the agreements contained in the Deed of Trust securing this note, the entire principal sum and accrued interest shall at once become due and payable without notice at the option of the holder of this note. Failure to exercise such option shall not constitute a waiver of the right to exercise it in the event of any subsequent default.

The makers and endorsers severally waive diligence, presentment, protest and demand, notice of protest, dishonor and nonpayment of this note, expressly agree that this note, or any payment thereunder may be extended from time to time, and consent to the acceptance of further security for this note, including other types of security, all without in any way affecting the liability of the makers and endorsers hereof. The right to plead any and all statutes of limitations as a defense to any demand on this note, or on any guaranty thereof, or to any agreement to pay the same, or to any demand secured by the Deed of Trust, or other security, securing this note, against makers, endorsers, guarantors, or sureties is expressly waived by each and all said parties.

Principal and interest are payable in lawful money of the United States. If action be instituted on this note, the undersigned promise(s) to pay such sum as the Court may fix as attorney's fees. This note is secured by a Deed of Trust, of even date herewith, to SACRAMENTO SECURITIES COMPANY as Trustee, on real estate situated in the County of Sacramento, California, and this note is to be construed according to the laws of California.

Should this note be signed by more than one person and/or firm and/or corporation, all of the obligations herein contained shall be considered joint and several obligations of each signer hereof.

[JOHN DOE]
[MARY DOE]

Petitioner usually sold the notes to the companies at a small discount, and was granted the right to collect a service fee for servicing the obligations, i.e., collecting the payments called for by the notes, paying the taxes, and generally doing the things necessary to keep any notes from being in default. The notes involved were generally of a long-term nature, the 30-year note shown above being of average length.

Before petitioner could sell these notes, it had to exert a great amount of effort in obtaining them. Brokers, builders, and architects had to be solicited to locate potential borrowers; the borrowers' credit had to be determined and the properties involved appraised; numerous forms had to be filled out, especially if Federal Housing Administration (FHA) or Veterans Administration (VA) financing was involved; cash for the loans had to be obtained through various banks; and the notes and deeds of trust had to be properly executed.

After petitioner obtained the notes it had to make the necessary arrangements for transferring the obligations to one of the insurance companies with which it had a service compensation agreement. Separate requests for each obligation had to be submitted to the insurance companies by petitioner. The insurance companies were required neither to accept all such applications nor purchase all obligations for a similar compensation to petitioner. Lengthy periods of time elapsed between petitioner's obtaining of a deed of trust note and its actual purchase by one of the insurance companies. During the years in issue petitioner found itself holding the notes for as long as a year (warehousing them), compared with an average 90 days in earlier years. Though petitioner thus collected the face amount of the interest speci-

fied by the notes during this period, it did not wish to hold them as investments due to its inability to absorb losses occasioned by the obligors' possible default.

During the years in issue petitioner sold the deed-of-trust notes it had produced at a loss. Competition dictated that it be available to initiate the notes at all times, even under adverse circumstances when there was no profit to be made. Had petitioner only produced them when a profit could be made, it might not have been able to stay in business.

Reproduced below is a schedule which represents the parties' respective positions as to petitioner's gross receipts and personal holding company income as defined by section 1372(e)(5) of the Code. Of the items shown, the parties' only disagreement is whether the amounts received for the deed-of-trust notes sold to the insurance companies during the years in issue are to be included as gross receipts.

### BUHLER MORTGAGE COMPANY, INC.

Schedule of Gross Receipts

| Item No. (see explanation attached) | | Taxable year ended 10/31/64 | | Taxable year ended 10/31/65 | |
|---|---|---|---|---|---|
| | | Petitioner's position | Respondent's position | Petitioner's position | Respondent's position |
| 1 | Sales of notes receivable (deed-of-trust notes) | $6,180,770.63 | | $6,286,734.86 | |
| 2 | Interest income | 127,685.01 | $127,685.01 | 138,848.02 | $138,848.02 |
| 3 | Loan fees | 123,523.97 | 123,523.97 | 127,569.00 | 127,569.00 |
| 4 | Loan service fees | 108,788.97 | 108,788.97 | 132,590.00 | 132,590.00 |
| 5 | Late charges | 3,006.17 | 3,006.17 | 3,330.00 | 3,330.00 |
| 6 | Miscellaneous income | 276.61 | 276.61 | 1,250.00 | 1,250.00 |
| 7 | Loan application fees | 20,056.72 | 20,056.72 | 21,196.07 | 21,196.07 |
| 8 | Credit report fees | 2,605.23 | 2,605.23 | 3,825.88 | 3,825.88 |
| 9 | Tax service fees | 5,580.50 | 5,580.50 | 3,700.82 | 3,700.82 |
| 10 | Rental income—L Street property | 2,188.76 | 2,188.76 | 1,162.00 | 1,162.00 |
| 11 | Rental income—Q Street partnership | 2,853.42 | 2,853.42 | 3,775.00 | 3,775.00 |
| 12 | Sales price—Fair Oaks property | | | 46,000.00 | 46,000.00 |
| 13 | Sales price—Q Street partnership property | | | 37,500.00 | 37,500.00 |
| | Total gross receipts | 6,577,335.99 | 396,565.36 | 6,807,481.65 | 520,746.79 |
| | 20% of gross receipts | 1,315,467.20 | 79,313.07 | 1,361,496.33 | 104,149.36 |

Income—Section 1372(e)(5) Internal Revenue Code of 1954

| | Taxable year ended 10/31/64 | | Taxable year ended 10/31/65 | |
|---|---|---|---|---|
| | Petitioner's position | Respondent's position | Petitioner's position | Respondent's position |
| Interest income | $127,685.01 | $127,685.01 | $138,848.02 | $138,848.02 |
| Rental income—L Street property | 2,188.76 | 2,188.76 | 1,162.00 | 1,162.00 |
| Rental income—Q Street partnership | 2,853.42 | 2,853.42 | 3,775.00 | 3,775.00 |
| Total | 132,727.19 | 132,727.19 | 143,785.02 | 143,785.02 |

### BUHLER MORTGAGE COMPANY, INC.

#### EXPLANATION OF INCOME ITEMS COMPRISING GROSS RECEIPTS

1. *Sales of Notes Receivable (loans).*—The principal of the loans sold is reflected under this classification.

2. *Interest Income.*—If Petitioner arranges for the financing of the loan and holds the loan either for its own account or for later sale, the borrower will make

interest payments on the loan to Petitioner. Petitioner also makes construction loans to contractors. This interest represents income derived from the use of money.

3. *Loan Fees.*—These fees are derived from the following sources:

(a) The fee on Federal Housing Administration and Veteran's Administration loans, as paid by the borrower, represents 1% of the original amount of the loan.

(b) A one and one-half per cent (1½%) fee is charged builders undertaking speculative residential construction.

(c) Fees ranging from one-quarter per cent (¼%) to one per cent (1%) are charged borrowers on conventional loans (not Federal Housing Administration or Veterans Administration residential loans) and commercial loans, either for construction or on existing properties.

(d) Premiums are paid to Petitioner for certain types of conventional (not Federal Housing Administration or Veterans Administration) loans.

4. *Loan Service Fees.*—In certain instances, the purchaser (insurance companies) of the loan will request Petitioner to service the particular loan by attending to the collection of monthly payments, keeping records of payments and their breakdown and attending to compliance with Federal Housing Administration and Veterans' Administration requirements. These service fees are in accordance with Petitioner's service compensation agreements with the purchasing insurance companies.

5. *Late Charges.*—When Petitioner is receiving payments on loans either held for its own account or for sale, penalties are collected for late payments.

6. *Miscellaneous Income.*—This represents income from miscellaneous sources including fees received for appraisals and from lectures.

7. *Loan Application Fees.*—This fee is collected by Petitioner from Borrower on Federal Housing Administration loans and remitted to the Federal Housing Administration.

8. *Credit Report Fees.*—Purchasers of the loans sometimes request credit reports on the particular borrower and Petitioner receives a fee for this report.

9. *Tax Service Fees.*—Purchasers of the loans will request reports on the status of property taxes as affect property securing the loan and Petitioner receives a fee for this service.

10. *Rental Income: L Street Property.*—During the years in question, Petitioner received income from a rental unit where no significant services were rendered.

11. *Rental Income: Q Street Partnership.*—During the years in question Petitioner was a partner in a partnership receiving rental income where no significant services were rendered by the partnership.

12. *Sales Price: Fair Oaks Property.*—This represents the gross sales price of real property sold by Petitioners.

13. *Sales Price: Q Street Partnership Property.*—This represents Petitioner's partnership share of the gross sales price of real propety sold by the partnership.

### ULTIMATE FINDING OF FACT

Petitioner's proceeds from the sales of the deed of trust notes were within the definition of "personal holding company income" under section 1372(e)(5) of the Code, but since there were no gains from such sales, no part of such proceeds constituted "gross receipts" to be taken into account under that section.

Under section 1372(e)(5) of the Code,[2] a corporation loses its election to be taxed under subchapter S of the Code if more than 20 percent of its gross receipts constitutes "personal holding company income." The parties have agreed on the amount of personal holding company income earned by petitioner during the years in issue, but are unable to agree whether such amount was more than 20 percent of its gross receipts. Their point of disagreement concerns the sale proceeds of certain deed-of-trust notes which petitioner sold to insurance companies. If the proceeds are included as part of petitioner's gross receipts for each year, its personal holding company income was less than 20 percent of its gross receipts. If the proceeds are excluded from gross receipts, then petitioner's personal holding company income was more than 20 percent of its gross receipts and its election terminated.

Resolution of this point depends upon whether the deed-of-trust notes constituted "securities" within the meaning of section 1372(e)(5.) If they were not "securities," there is no question that the proceeds from their sale would be included in petitioner's gross receipts. If they were such "securities," section 1372(e)(5) provides that the proceeds from their sale constitute gross receipts only to the extent of the gain thereon. In the instant case the notes were sold at a loss in each year before us and thus no amount derived from their sale would constitute gross receipts.[3]

The subchapter S provisions do not define the term "securities." Section 1.1372-4(b)(5)(viii), Income Tax Regs., defines "securities" for purposes of Code section 1372(e)(5) by reference to section 1.543-1(b)(5)(i), Income Tax Regs. (dealing with personal holding company income), which definition reads as follows:

The term "stock or securities" * * * includes shares or certificates of stock, stock rights or warrants, or interest in any corporation (including any joint stock company, insurance company, association, or other organization classified

---

[2] SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

  (e) TERMINATION.—

      (5) PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

[3] We also note that if the notes are "securities" any gain would, in addition to being considered part of gross receipts, also be added to petitioner's personal holding company income.

as a corporation by the Code), certificates of interest or participation in any profit-sharing agreement, or in any oil, gas, or other mineral property, or lease, collateral trust certificates, voting trust certificates, bonds, debentures, certificates of indebtedness, *notes*, car trust certificates, bills of exchange, obligations issued by or on behalf of a State, Territory, or political subdivision thereof. [Emphasis supplied.]

It is respondent's position that since the deed-of-trust notes are notes and the regulations state that notes are securities, the deed-of-trust notes in the instant case were securities. We agree.

Petitioner's position is first that the notes in question are not the type of notes which the Code or the regulations envision. Alternatively, it contends that if the regulations do include these notes, then such regulations should be struck down as invalid.

In support of its position, petitioner cites the legislative history of the subchapter S provisions, specifically S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966-1 C.B. 532, which states that the subchapter S provisions were passed to allow only small businesses actively engaged in a trade or business to make the election. Those businesses with large amounts of passive income were not to have the option of electing subchapter S treatment. Consequently, Congress denied the election to those corporations which had large amounts of investment-type income such as royalties, rents, dividends, interest, annuities, and profits from the sales or exchanges of stock and securities. From this, petitioner concludes that since it had to expend a great deal of effort and engage in many activities in order to produce the notes which it sold to Bankers and Acacia, such proceeds should not be considered of a passive nature. Petitioner concludes that the proceeds are thus not within the definition of the Code or the regulations as personal holding company, or passive income.[4]

In support of this position petitioner cites section 1.543-1(b)(5)(ii), Income Tax Regs., which excludes security dealers' sales of securities from personal holding company income.

Though we agree with petitioner that the subchapter S provisions were not intended to include corporations with large amounts of investment-type income (as opposed to those actively engaging in trades or businesses) we cannot find that the nature of the income changes simply because the corporation earning it must engage in many activities and exert a great deal of effort in doing so. The standard used by the Code and the regulations does not permit us to look behind the normal characterizations of a corporation's receipts in order to classify them as active or passive. If this were not so, we can only

---

[4] Sec. 1372(e)(5) was amended in 1966 by Pub. L. 89-389, which *inter alia* changed the term "personal holding company income" to "passive income." At times throughout this opinion the terms may be used interchangeably.

guess at what criteria might be properly used to say, e.g., that a rent item was "active" because the tenant was such poor pay, or that a dividend item was "active" because a stockholder's bill had to be brought to force the directors to declare and pay it. We conclude that the test established is one which requires us to look only to the plain meaning of the words used to define the income, not to the activity required to produce it. Secured promissory notes are clearly within the meaning of "securities" as that term is employed by section 1372(e)(5).

The evidence in the instant case indicates that the interest income which petitioner collected on unsold deed-of-trust notes required a considerable amount of its time. However, we do not look behind this interest income for the effort expended in collection before calling it personal holding company income, and petitioner does not ask us to do so. We see no persuasive reason for treating proceeds from sales of notes any differently.

Petitioner also argues that it did not speculate in or buy and sell the notes in question, but "initiated" or "originated" them with a great deal of activity and effort so that it could sell them to Bankers or Acacia and thereby become entitled to service the loans. As expressed by petitioner's president:

our business is not owning loans, it is producing them and rolling them over constantly to build our servicing account.

Petitioner argues that its most important function and source of income was from servicing these loans; that this was its true business (clearly not excluded from the subchapter S provisions) and that producing and selling the notes was simply one of the necessary adjuncts to its business of servicing.

The main difficulty with this argument is that it is not supported by the facts of the instant case, and we therefore reject it. During the years in issue petitioner's loan service fees produced (rounded) $109,000 and $133,000, respectively, while its interest income, which was admittedly largely from the warehousing of these notes, and the loan fees obtained from their production yielded petitioner more than double these amounts. In one sense, it could be said that all of petitioner's activity in producing the notes was paid for by the loan fees, leaving the character of the notes as passive "securities" unimpaired.

Petitioner's citation of section 1.543–1(b)(5)(ii), Income Tax Regs., is not helpful. That section, exempting gain on sales of securities by securities dealers from personal holding company income,

was promulgated in connection with section 543(a)(2) of the Code which read (prior to its amendment in 1964, Pub. L. 88–272) as follows:

SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of:

\*  \*  \*  \*  \*  \*  \*

(2) STOCK AND SECURITIES TRANSACTIONS.—Except in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities.

Thus the above exception was granted only by virtue of a specific provision of the Code. No similar provision exists under the subchapter S provisions, and in the absence of any such statutory exclusion, we cannot imply any exclusion, for petitioner's benefit by judicial fiat.

Inasmuch as the regulations specify notes as constituting securities, and the notes in the instant case are typically 30 years in duration and secured by deeds of trust, we hold that such notes are securities as defined by the Code and the regulations no matter what the effort involved in their production and disposition. As the deed of trust notes were in the classic form of a note, there is no generic problem here of the notes being called notes, but actually being something else (i.e., such as the situation where an item is labeled rent, but is actually more a payment for services rendered than for the use of property). See *Max Feingold*, 49 T.C. 461 (1968). Nor is there the problem that the notes in the instant case are so closely related to cash or other nondebt instruments that they wouldn't ordinarily be thought of as securities.

The definition of a security as defined by the regulations has remained constant since the regulations under subchapter S were promulgated in 1959. See T.D. 6432, 1960–1 C.B. 317, 331. Treasury regulations are valid unless unreasonable or plainly inconsistent with the statute under which they are issued and they should not be set aside except for weighty reasons. *Richard R. Wilbur*, 43 T.C. 322, 328 (1964), and the cases cited therein. Petitioner stresses that the regulations under subchapter S have in part been declared invalid by this Court and other courts, citing *W. C. Gamman*, 46 T.C. 1 (1966); *Valley Loan Association* v. *United States*, 258 F. Supp. 673 (D. Colo. 1966); and *A. & N. Furniture & Appliance Co.* v. *United States*, 271 F. Supp. 40 (S.D. Ohio 1967). However, the portions of the regulations struck down in those cases do not relate to the question presented here, consequently we see no need to discuss them further.

The definition of a security under section 1.1372–4(b)(5)(viii) and section 1.543–1(b)(5)(i) of the regulations is similar to the defini-

tion set out in section 1236(c) of the Code [5] and we do not find any reason to hold it inconsistent with the intent of section 1372(e)(5).

During the years in issue petitioner simply had more interest and other forms of personal holding company income than permitted by the statute. We sympathize with its plight of not being able to reduce this type of income, but we cannot unreasonably strain the language of the Code and regulations to effect a result which was not intended by either.

We find and hold that the proceeds which petitioner received from the sales of the deed-of-trust notes constituted proceeds from sales of securities. As such, since there were no gains, they were not includable in petitioner's gross receipts for purposes of the section 1372(e)(5) limitation. This means that during each of the years in issue petitioner's personal holding company income exceeded 20 percent of its gross receipts and consequently its election to be taxed as a subchapter S corporation was terminated as to each of the years in issue.

Reviewed by the Court.

*Decision will be entered for the respondent.*

Irwin, *J.*, concurs in the result.

---

[5] SEC. 1236. DEALERS IN SECURITIES.

(c) DEFINITION OF SECURITY.—For purposes of this section, the term "security" means any share of stock in any corporation, certificate of stock or interest in any corporation, *note,* bond, debenture, or evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing. [Emphasis supplied.]