City Markets, Inc., et al. [1] v. Commissioner. City Markets, Inc. v. Commissioner
Docket Nos. 6485-67-6489-67.
United States Tax Court
T.C. Memo 1969-202; 1969 Tax Ct. Memo LEXIS 99; 28 T.C.M. (CCH) 1055; T.C.M. (RIA) 69202; September 29, 1969, Filed J. Alan Hanover, 219 Adams Ave. Bldg., Memphis, Tenn., for the petitioners. Jack D. Yarbrough, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in the income tax of petitioner City Markets, Inc., as follows: Year Ending
Deficiency
Addition to taxunder sec. 6651(a) [2]
Feb. 29, 1964
$5,991.32
Feb. 28, 1965
4,066.45
$406.65
Feb. 28, 1966
5,902.82 1056 Respondent determined deficiencies in the income taxes of petitioners Jay A. (J. Alan) and *100 Helen L. Hanover, Joseph and Jean K. Hanover, Kenneth P. Hanover, and Olga F. Hanover, as follows: Petitioner
Taxable year1964
Taxable year1965
Jay A. Hanover and Helen L. Hanover
$461.70
$ 736.06
Joseph Hanover and Jean K. Hanover
436.52
1,958.70
Kenneth P. Hanover
51.00
531.53
Olga F. Hanover
269.33 Respondent found an overassessment of $41.38 in the income tax of Olga F. Hanover for her taxable year 1964. The only issue raised by the petitioners is whether petitioner City Markets, Inc.'s election under Subchapter S was terminated by the receipt of "rent" in excess of 20 percent of gross receipts. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner City Markets, Inc., had its principal offices in Memphis, Tennessee, at the time its petition herein was filed. Each individual petitioner had his legal residence in Memphis, Tennessee, at the time of the filing of his petitions herein. Petitioner City Markets, Inc., filed its Federal income tax returns for the fiscal years 1964, 1965, and 1966 with the district director of internal revenue at Nashville, Tennessee. Petitioner Olga F. Hanover, the widow of David *101 Hanover, filed her separate income tax returns for 1964 and 1965 with the district director of internal revenue at Nashville, Tennessee, as did petitioner Kenneth P. Hanover. Petitioners Jay A. (J. Alan) Hanover and Helen L. Hanover, husband and wife, filed their joint Federal income tax returns for 1964 and 1965 with the district director of internal revenue at Nashville, Tennessee, as did petitioners Joseph Hanover and Jean K. Hanover, husband and wife. During the taxable years involved, all of the stock of the corporation was owned by the estate of David Hanover and petitioner Joseph Hanover; the estate distributed all of its distributions from the corporation to the other individual petitioners herein. During the taxable years involved, the corporation owned a market in Memphis bounded by Poplar Avenue on the south, Cleveland Street on the west, Larkin Avenue on the north, and Morgan Place on the east. Two long, roofed structures paralleled Cleveland Street (the west market building) and Morgan Place (the east market building) and were occupied primarily by sellers of farm produce and flower vendors, who displayed their produce on wooden benches or tables on either side of *102 a center aisle. The west market building was occupied primarily by the flower vendors; it also housed a meat market, some restaurants, a health food store, a bakery, and an open-air garden shop. A one-story brick building, occupied by a florist, abutted this building at its south end. The east market building was occupied primarily by the vendors of farm produce and also by an automobile repair shop. In addition, a brick building abuutting the south end of this building was occupied by a meat market. There were five public restrooms in the market buildings. There were a series of brick buildings facing Polar Avenue, separated by walls and with no common passageway. The various tenants of the buildings during the periods involved herein included a night club, restaurant, liquor store, real estate office, and drug store. These tenants had their own restroom facilities. There was parking space in the center of the block in back of the Poplar Avenue building and between the two market buildings, with access from the abutting streets. There was also parking space in front of the Poplar Avenue building. The written lease arrangements between the corporation and its tenants imposed *103 no obligations or liability on the corporation other than to afford the tenant "quiet, peaceful and uninterrupted possession" and to make "those repairs due to structural defects." The form of written lease expressly provided that the corporation should not be liable for any damage in consequence of "leaks * * * stoppages in water, sewer, gas, or drain pipes, * * * freezing, nor for any other cause or obstruction, nor defect," the tenant being required to remedy the same. Some of the market buildings' tenants were covered by oral leases. During the taxable years in issue, the corporation employed a maintenance man (Wooley) and an assistant (Fleming). Both men worked full time, six days per week. They were the corporation's only full time employees. They were not closely supervised in their work. 1057 Their activities included cleaning and sweeping and maintaining the five public restrooms, the sidewalks and alleys around the buildings, and some parts of the interiors of the buildings; repairing the parking area pavements; spraying garbage cans with insecticide to keep down flies; unblocking stopped-up sewer lines; repairing electrical, heating, and air conditioning equipment; *104 making roof repairs; and replacing broken windows. The tenants were not charged for these services, nor were they charged when Wooley found himself unable to make a needed repair and had to call in outside repairmen. Tenants, especially in the market buildings, would often ask Wooley to make alterations in their booths; Wooley would make these alterations, charging nothing for his labor, and charging for materials only if the improvement was not physically attached to the building. Wooley also kept automobiles from parking where they would block the entrances to the inner parking area, and would, on occasion, take telephone messages for tenants and answer questions as to prices by potential customers on the telephone. Neither Wooley nor Fleming helped the tenants load or unload trucks. On occasion, Wooley was called in by a private night patrol engaged by the tenants, in order to check on stores which had been broken into. The corporation during the years in issue furnished pest control on a monthly basis. It also advertised its tenants' activities in the yellow pages of the telephone directory and also maintained a large sign advertising the market as a whole. All of the gross *105 receipts of the corporation consisted of payments from its tenants. It had at least 25 tenants. In fiscal 1964, its receipts were $62,891.06; in fiscal 1965, $62,915.62; and in fiscal 1966, $68,007.06. These amounts included $2,700 in each year from billboard rentals. In each year, more than 20 percent of the receipts came from tenants of the Poplar Avenue building. Amounts spent on services to the tenants, except insofar as reflected in the salaries of the maintenance men and advertising in the yellow pages, were classified on the corporation's books as "repairs," "supplies," or "miscellaneous," along with other items. The corporation spent $1,021.28 on "repairs" in fiscal 1964, $3,773.00 in fiscal 1965, and $5,265.53 in fiscal 1966. It spent $1,216.10 on "supplies" in fiscal 1964, $769.98 in fiscal 1965, and $795.74 in fiscal 1966. It spent $100.70 on "miscellaneous" in fiscal 1964, $149.26 in fiscal 1965, and $684.40 in fiscal 1966. In addition, during the taxable years involved, it spent $14.20 per month for the advertisement in the yellow pages and paid Wooley a weekly salary varying from $72.00 to $82.50 and Fleming a weekly salary of $45.00. Opinion The only issue is *106 whether more than 20 percent of the gross receipts of the corporate petitioner constituted "rents" within the meaning of section 1372(e)(5) [3] If so, the parties are agreed that the corporation's election under section 1372 is terminated and that the corporation should be taxed as an ordinary corporation. *107 The corporation owned and maintained several buildings which took up an entire city block and derived all of its income during the years in issue from leasing parts of those buildings. While in common usage such receipts would clearly be called "rents," the regulations have laid down a somewhat more liberal test: Rents. The term "rents" as used in section 1372(e)(5) means amounts received for the use of, or right to use, property (whether real or personal) of the corporation whether or not such amounts constitute 50 percent or more of the gross income of the corporation for the taxable year. The term "rents" does not include payments for the use or occupancy of rooms or other space where significant services are also rendered to the occupant, such as for the use or occupancy of rooms or other quarters in hotels, 1058 boarding houses, or apartment houses furnishing hotel services, or in tourist homes, motor courts, or motels. Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only. The supplying of maid *108 service for example, constitutes such services; whereas the furnishing of heat and light, the cleaning of public entrances, exits, stairways and lobbies, the collection of trash, etc., are not considered as services rendered to the occupant. Payments for the use or occupancy of entire private residences or living quarters in duplex or multiple housing units, of offices in an office building, etc., are generally "rents" under section 1372(e)(5). Payments for the parking of automobiles ordinarily do not constitute rents. Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments. [(b)(5)(iv), Income Tax Regs., adopted by T.D. 6432, 1960-1 C.B. 317, 330.] Petitioners do not question the validity of this regulation. Bramlette Building Corp., 52 T.C. 200 (1969), on appeal (C.A. 5, 1969); Max Feingold, 49 T.C. 461 (1968). Rather, they contend that the corporation satisfied the requirement of the regulation in that it rendered "significant services" to its tenants which were not of the type usually provided in connection with the rental *109 of space for occupancy only. We see no need to repeat the services which the corporation furnished. They are set forth in detail in our findings of fact. After careful consideration, we have concluded that the services were not significant within the meaning of respondent's regulation and the rubrics of our decisions in Bramlette Building Corp., supra, and Max Feingold, supra. So far as the record shows, the corporation was not formally obligated to provide any services. Where there were written leases, the lease agreements limited the corporation's duties to repairing "structural defects." There is no evidence of any oral agreements with respect to services. And, in fact, the performance of many of the services was left to the discretion of the senior maintenance man. Moreover, in relation to the number of tenants, the scale of services rendered to them was not very great; there were only two maintenance men to serve both their needs and those of the corporation. In short, we are unable to conclude that the tenants considered that their payments to the corporation covered anything beyond their right to occupy the premises. In this connection, we note that *110 a smaller amount of services was rendered to the tenants of the Poplar Avenue building and that the amounts received from these tenants were more than 20 percent of the corporation's gross receipts. Finally, we think it not without significance that Congress amended the particular provision involved herein in 1966 (see footnote 3, supra) long after respondent's regulation was adopted by T.D. 6432, supra. In so doing, it was fully cognizant of the problems of passive as contrasted with operating receipts, and yet it did not see fit to suggest an expansive concept of "significant services." On the contrary, the Committee Reports reiterated its view that the Subchapter S election should generally be available only to corporations actively engaged in a trade or business. See H. Rept. No. 1238, 89th Cong., 2d Sess., p. 8 (1966); S.Rept. No. 1007, 89th Cong., 2d Sess., pp. 8-9 (1966). We cannot say that the corporation herein was so engaged. We conclude that the amounts received from its tenants constituted "rents" within the meaning of section 1372(e)(5). Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolicated herewith: Jay A. Hanover [also known as J. Alan Hanover] and Helen L. Hanover, Docket No. 6486-67; Joseph Hanover and Jean K. Hanover, Docket No. 6487-67; Olga F. Hanover, Docket No. 6488-67; and Kenneth P. Hanover, Docket No. 6489-67.↩
2. All statutory references herein are to the Internal Revenue Code of 1954.↩
3. During the years in issue, the following statutory provision was in effect: SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. * * * (e) Termination. - * * * (5) Personal holding company income. - An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. This section has since been amended in several respects not relevant herein. See Pub. L. 89-389, 89th Cong., 2d Sess. (1966), 80 Stat. 111.↩