JOSEPH B. ZYCHINSKI AND MARIE H. ZYCHINSKI, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 882–72, 883–72. Filed September 20, 1973.

*Harvey G. Schneider*, for the petitioners.
*Matthew W. Stanley*, for the respondent.

HALL, *Judge:* Respondent determined deficiencies in the Federal income taxes of Joseph B. and Marie H. Zychinski and the Estate of Henry J. Richter, deceased, and Erma A. Richter, as follows:

| Petitioners | Year | Deficiency |
|---|---|---|
| Joseph B. and Marie H. Zychinski | 1966 | $1, 031. 25 |
| | 1967 | 229. 97 |
| Total | | 1, 261. 22 |
| Estate of Henry J. Richter, deceased, and Erma A. Richter. | 1963 | $19, 256 |
| | 1964 | 96, 728 |
| | 1966 | 6, 644 |
| | 1967 | 2, 802 |
| Total | | 125, 430 |

[1] Consolidated herewith is Estate of Henry J. Richter, Dec'd., Erma A. Richter and Nancy Monson, Co-Executrices, and Erma A. Richter, Surviving Spouse, docket No. 883–72.

The sole issue is whether more than 20 percent of the gross receipts of Henry J. Richter & Co. for its fiscal year ending October 31, 1966, constituted passive investment income within the meaning of section 1372(e)(5),[2] with the result that the company's status as an electing small business corporation was terminated for such year and succeeding years.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, Joseph B. and Marie H. Zychinski, husband and wife, resided in St. Louis, Mo., when they filed their petition in this case. They filed joint Federal income tax returns for the taxable years 1966 and 1967 with the district director of internal revenue at St. Louis.

Erma A. Richter and Nancy Monson are coexecutrices of the Estate of Henry J. Richter, who died on August 8, 1970. The Estate of Henry J. Richter is being probated in St. Louis County, Mo. Erma A. Richter, decedent's surviving spouse, resided in St. Louis, Mo., when in her capacity as coexecutrix and surviving spouse she filed her petition in this case. Henry J. and Erma A. Richter filed joint Federal income tax returns for the years 1963, 1964, 1966, and 1967 with the district director of internal revenue at St. Louis.

Marie H. Zychinski and Erma A. Richter are parties to this proceeding solely by virtue of having filed joint returns with their husbands.

Henry J. Richter & Co. (hereinafter Richter & Co.) was incorporated under the laws of Missouri on July 31, 1964. According to its October 31, 1966, tax return, it had 4,000 shares of stock issued and outstanding. Henry J. Richter was president and the parties have stipulated that he owned all but 101 shares of the issued and outstanding stock of Richter & Co. Petitioner Joseph B. Zychinski was treasurer and the owner of 100 shares of Richter & Co.[3] Richter & Co. maintained its books and records and reported its income on a fiscal year ending October 31. For its fiscal years ended October 31, 1966 and 1967, it timely filed Federal income tax returns with the district director of internal revenue at St. Louis. Prior to the commencement of its fiscal year ended October 31, 1966, Richter & Co. had filed a valid election to be taxed as a small business (subchapter S) corporation, and during the years ending October 31, 1966 and 1967, considered itself still to be a valid subchapter S corporation.

During fiscal years 1966 and 1967, Richter & Co. was actively engaged in the securities business. Its principal office was in St. Louis.

---

[2] All Code references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[3] According to Richter & Co.'s 1966 return, Zychinski owned 135 shares. The discrepancy between this and the stipulation is unexplained, but is immaterial for present purposes.

and it maintained branch offices in San Francisco, Los Angeles, and New York, and operated correspondent relationships with other securities firms in Denver, Cleveland, Dallas, and Chicago.

Richter & Co.'s business activities consisted primarily of two functions: (1) The trading of stocks or securities, with respect to which the company acted as a principal by purchasing and selling for its own account; and (2) the placing of purchase and sales orders as a broker or agent on a commission basis for listed and over-the-counter securities on behalf of a customer. In addition, Richter & Co. engaged in some underwriting of new and existing issues of securities, and operated as an intermediary in connection with mergers and acquisitions of various companies.

The greater part of Richter & Co.'s activities was devoted to the purchase and sales of stocks or securities for its own account, for and from the inventory which it maintained for that purpose. The majority of sales of securities from its inventory were "wholesale" sales, meaning sales to broker-dealers. A minority of sales were "retail" sales, meaning sales to buyers who were not broker-dealers.

During the years in issue, Richter & Co. purchased and sold and maintained an inventory of 50 to 100 different securities traded in the over-the-counter market. Richter & Co. "made a market" in these over-the-counter securities. "Making a market" in such securities meant that the company, as a qualified securities dealer, in accordance with the practices of the securities industry, had published and advertised in trade circles that it would buy or sell such securities from and to other securities dealers, either purchasing for its inventory or selling from its inventory of such securities, and was required to make purchases and sales in accordance with industry practice. From this inventory of securities, Richter & Co. conducted a business of wholesaling the securities to other brokerage firms on a national basis.

Richter & Co. did not purchase any securities for investment during the years in issue. No sales of securities were reported on the company's tax returns for the years in issue as capital transactions. In subsequent years, when the company did buy securities for investment, it segregated and recorded such purchases in an investment account and did not commingle them with inventory. Sales of such investment securities were reported on the company's tax returns as capital transactions.

Richter & Co.'s receipts during the taxable years in issue had several components. Minor items included dividends and interest earned on its wholly or jointly owned securities. The company also received commission income, its compensation for services rendered with respect to its underwritings and brokerage functions.

The principal component, however, was the gains generated by

Richter & Co.'s trading for its own account. Gains were treated and recorded in two of the company's general ledger accounts, one desig-. nated the "retail profit" account, and the other the "trading profit" account. The "retail profit" account, some $79,000 in gross amount in fiscal 1966, represented only a portion of the company's gains on retail sales. Gains on retail sales other than that portion recorded in the "retail profit" account were recorded in the "trading profit" account. Thus, the company's "trading profit" of approximately $155,000 in fiscal 1966 represented gains on both wholesale and retail sales. The figure of $155,000 is a net amount, losses having been offset against gains, resulting from hundreds of transactions. The company's gains on securities trading for its own account amounted to far more than 20 percent of its gross receipts.

Richter & Co. was registered with the Securities and Exchange Commission as a broker-dealer; was a member of the Midwest Stock Exchange; was registered by the City of St. Louis to carry on the business of investment securities; and was a member of the National Association of Securities Dealers, Inc., among other securities associations to which it belonged.

During the years in issue, Richter & Co. on a continuous basis advertised in such trade publications as the Financial Chronicle, the TWX Guide, the Traders Guide, and the Investment Dealers Digest, and in the Wall Street Journal and the financial sections of the St. Louis newspapers. In addition, Richter & Co. maintained listings in the listings service (generally referred to as the Pink Sheets, and also the Green Sheets for broker-dealers in Western States) utilized by securities dealers and brokers (as published by the National Quotation Bureau, Inc.) wherein the company listed the securities that it was offering to purchase and sell at the time of listing (together with bid and asked prices). This listings service was generally circulated among securities brokers, securities dealers, and other financial institutions.

Richter & Co. ceased operation in May 1970 when involuntary bankruptcy proceedings were instituted by the Securities and Exchange Commission because the company failed to comply with the Securities and Exchange Commission's net capital requirements. The bankruptcy proceedings are presently pending in the U.S. District Court for the Eastern District of Missouri.

Richter & Co. reported net operating losses of $170,283 and $152,712 for its fiscal years ended October 31, 1966 and 1967, respectively. On their 1966 and 1967 returns, Henry J. and Erma A. Richter claimed deductions of $164,536 and $148,321, respectively, as their pro rata share of the net operating losses sustained by the company for its fiscal years ended October 31, 1966 and 1967. As a result of these losses,

they claimed and timely filed application for net operating loss carry-backs to 1963 and 1964.

On their 1966 and 1967 returns, petitioners Joseph B. and Marie H. Zychinski claimed deductions of $5,747 and $1,074, respectively, as their pro rata share of the net operating losses sustained by the company for its fiscal years ended October 31, 1966 and 1967.

The parties agree that if this Court holds that Richter & Co. was a valid subchapter S corporation in 1966 and 1967, petitioners are entitled to the net operating loss deductions claimed on their returns.

### OPINION

The parties are in agreement on the fact that over 20 percent of the gross receipts of Richter & Co. for its fiscal year ended October 31, 1966, came from its profits on securities trading. The question of the corporation's qualification as a subchapter S corporation is one of law, turning on the construction of section 1372(e)(5), defining passive investment income.[4]

Petitioner contends that section 1372(e)(5) was never intended to prevent an active business from being a subchapter S corporation, and, therefore, contrary to the literal language of that section, receipts derived from "sales or exchanges of stock or securities" by a securities dealer like Richter & Co. do not constitute "passive investment income."

Respondent reads section 1372(e)(5) literally, pointing out that it specifically defines "passive investment income" to include receipts derived from "sales or exchanges of stock or securities," without specifying that such receipts must be derived from inactive operations. We agree with respondent.

---

[4] Sec. 1372(e)(5), as in effect for the years in issue in this case and prior to its amendment by Pub. L. 91-683 (Jan. 12, 1971), provided:

(5) PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

(B) Subparagraph (A) shall not apply with respect to a taxable year in which a small business corporation has gross receipts more than 20 percent of which is passive investment income, if—

(i) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year; and

(ii) the amount of passive investment income for such taxable year is less than $3,000.

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). * * *

The parties agree that Richter & Co. was an active business operation, that more than 20 percent of its gross receipts was derived from the sale of securities, and that it was a valid subchapter S corporation for its fiscal year ended October 31, 1966, unless its election to be such was terminated under section 1372(e)(5).

Petitioner first argues that the legislative history of subchapter S [5] clearly indicates that subchapter S status is to be available to corporations conducting active business operations, whereas Congress intended to deny the election to businesses with large amounts of investment-type income such as royalties, rents, dividends, interest, annuities, and profits from the sale or exchange of stocks and securities. Moreover, petitioner notes, the Fifth Circuit in *House* v. *Commissioner*, 453 F. 2d 982 (C.A. 5, 1972), reversing a Memorandum Opinion of this Court, has so held.[6]

Moreover, petitioner claims, *House* v. *Commissioner*, *supra*,[7] is the only case directly in point. The question presented in that case was whether certain corporations engaged in the small loan business lost their subchapter S status by virtue of the fact that the income received from their business operations constituted interest. The Fifth Circuit, in reversing the Tax Court, held that the Tax Court had "erred in finding that lending and finance companies actively engaged in the business of making loans are subject to the subchapter-S termination provisions of section 1372(e)(5)." In *House*, 453 F. 2d at 985, the Commissioner argued, as he does here, that:

The language of Section 1372(e)(5) is clear. It states that the Subchapter S status of a company will terminate if more than 20 percent of its gross receipts in a taxable year is derived from interest. There is nothing vague or confusing in such language. *The statute makes no "passive" interest versus "active" interest distinction. It just says interest.* No reference is made in the statute to the personal holding company tax provisions, and there is no legislative history indi-

---

[5] S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 532–533.

[6] Sec. 1372(e)(5) as originally enacted provided:

(5) PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

The 1966 amendment (Pub. L. 89–389) changed the heading of par. (5) from "Personal Holding Company Income" to "Passive Investment Income" without specifying any reason for the change in terminology. However, the Senate committee report did say: "New subparagraphs (A) and (C) of section 1372(e)(5) contain the same general rule as existing law." S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 541. The 1966 amendment applies to taxable years of subchapter S corporations ending after Apr. 14, 1966, including the year in issue here.

[7] *House* v. *Commissioner*, 453 F. 2d 982 (C.A. 5, 1972), dealt with sec. 1372(e)(5) prior to the 1966 amendment, but the effect, if any, of such amendment was considered by the Fifth Circuit in its deliberations.

cating that such a reference was intended. The test imposed is an objective, mathematical one.

\* \* \* \* \* \* \*

Thus, whether or not the interest received by loan companies *be considered "active" or "passive" income,* it is still interest, and interest is specifically included in the Subchapter S termination provision of Section 1372(e)(5) \* \* \* [Emphasis in the original.]

However, the Fifth Circuit concluded that "the words 'personal holding company income' and 'passive investment income' were deliberately employed by Congress to make clear its legislative purposes," and that the word "interest" could not be read in "isolation." Rather, to "give purpose to the entire Congressional Act," the Fifth Circuit held that interest earned by a small loan company was not "passive investment income."

Since the parties filed their briefs in this case, this Court has, by reviewed decision, concluded it will not follow *House* v. *Commissioner. I. J. Marshall,* 60 T.C. 242, 252 (1973). In *Marshall* we stated:

we specifically held in *Buhler Mortgage Co.* that the fact that active efforts might have been exerted to produce interest or rental income did not cause that income not to be "personal holding company income" or "passive investment income" under the provisions of section 1372(e)(5). We further held that the fact that an exemption of certain income or a certain type of income from the provisions of the personal holding company income under section 543 did not cause a similar exclusion to exist under section 1372(e)(5). In our view our holding in *Buhler Mortgage Co.* which has now been affirmed per curiam by the U.S. Court of Appeals for the Ninth Circuit (443 F. 2d 1362), cannot be reconciled with the holding of the Fifth Circuit in *House* v. *Commissioner, supra.* We therefore respectfully decline to follow the Appeals Court's holding in the *House* case and conclude that interest and rental income are part of "passive investment income" even though the recipient of such interest or rental income may be actively engaged in a small loan or real estate business.

And so we conclude here, as we did in *Buhler Mortgage Co.,* 51 T.C. 971, 977–978 (1969), that:

Though we agree with petitioner that the subchapter S provisions were not intended to include corporations with large amounts of investment-type income (as opposed to those actively engaging in trades or businesses) we cannot find that the nature of the income changes simply because the corporation earning it must engage in many activities and exert a great deal of effort in doing so. The standard used by the Code and the regulations does not permit us to look behind the normal characterizations of a corporation's receipts in order to classify them as active or passive. If this were not so, we can only guess at what criteria might be properly used to say, e.g., that a rent item was "active" because the tenant was such poor pay, or that a dividend item was "active" because a stockholder's bill had to be brought to force the directors to declare and pay it. We conclude that the test established is one which requires us to look only to the plain meaning of the words used to define the income, not to the activity required to produce it. \* \* \*

Petitioner also argues that, granted "passive investment income" includes receipts derived from "sales or exchanges of stock or securi-

ties," such term does not apply to ordinary gross receipts received by a securities dealer in the ordinary course of business, but rather was intended to refer only to transactions involving capital assets.

Moreover, petitioner argues, respondent's regulation (section 1.1372–4(b)(5)(x), Income Tax Regs.) which provides in part as follows:

Gross receipts from the sale or exchange of stocks and securities include gains received from such sales or exchanges by a corporation even though such corporation is a regular dealer in stocks and securities.

is not inconsistent with petitioner's alternative position. The sales of securities by a securities dealer referred to in the regulations, argues petitioner, refer not to sales in the regular course of its business, but to dealer's sales of investment securities which are capital assets of the dealer and not inventory.

The basic problem with petitioner's argument is that the language of section 1372(e)(5) nowhere limits "sales or exchanges of stock or securities" to capital assets, nor does it differentiate between trade or business activity and nonbusiness activity. "Sale or exchange" is frequently used in the Code in connection with property held for sale to customers in the ordinary course of business. See, for example, section 1236 which provides in part that gain derived by a securities dealer from sales or exchanges of securities is ordinary income unless the security is clearly identified in the dealer's records as held for investment. See also section 1.61–6(a), Income Tax Regs., which defines gross income as including "Gain realized on the sale or exchange of property."

Furthermore, we find respondent's regulation, explicitly applying section 1372(e)(5) to regular dealers in stocks and securities, to be reasonable and consistent with the language of the statute.

In accordance with the foregoing,

*Decisions will be entered under Rule 50.*