H. L. DAVENPORT AND NEYSA C. DAVENPORT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5317–76.     Filed September 14, 1978.

*J. Howard Hayden,* for the petitioners.
*William T. Overton,* for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1968 | $1,710.99 | 1970 | $8,584.39 |
| 1969 | 2,836.71 | 1972 | 1,515.45 |

There are three issues: whether petitioners' loss on Greenbelt Finance, Inc. (hereinafter Greenbelt), stock, purchased in 1959, was a loss on section 1244[1] stock; whether petitioners are entitled to an ordinary loss deduction under section 165(a) for Greenbelt stock purchased in 1968; and whether petitioners are entitled to a bad debt deduction under section 166(a) for loans made to Greenbelt.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners H. L. and Neysa C. Davenport, husband and wife, were residents of Pflugerville, Tex., when they filed their petition herein. They filed their joint income tax returns for the years in question with the Internal Revenue Service Center, Austin, Tex.

In 1940, after completing 2½ years of college, H. L. Davenport (hereinafter petitioner) started working for Ray Green Finance Co. in Childress, Tex. In his employment, petitioner made loans and handled insurance on automobiles. In 1959, because he felt he was undercompensated, petitioner ended his employment with Ray Green Finance Co. and organized Greenbelt, a Texas corporation, for the purpose of operating a small loan business. Greenbelt was authorized and had issued 100,000 shares of $1 par common stock that was intended to qualify as section 1244 stock. Petitioner purchased 20,000 shares; 15 other investors purchased the remaining 80,000 shares. Petitioner was made

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question.

president of the company and thereafter remained in that capacity. His initial salary as president was $7,200 per year. In 1969 his salary was raised to $10,800 per year and thereafter it was raised to $12,000 per year.

Following Greenbelt's incorporation, petitioner purchased additional amounts of stock from other stockholders at various prices. By 1971 petitioner owned 76,272 shares of stock purchased at the following time and amounts:

| Year acquired | Number of shares | Cost |
|---|---|---|
| 1959 | 20,000 | $20,000.00 |
| 1964 | 2,062 | 1,855.80 |
| 1965 | 1,063 | 1,063.00 |
| 1968 | 52,147 | 59,841.90 |
| 1971 | 1,000 | 1,226.84 |
| Total | 76,272 | 83,987.54 |

During the years before us, the remaining authorized shares were held by petitioner's daughter and by Greenbelt as treasury stock.

Petitioner's large purchase of stock in 1968 was a result of a directors meeting held October 17, 1968. At that meeting the directors discussed financing problems the corporation was having with two lending banks. The banks had presented Greenbelt with three options under which they would continue to lend money to Greenbelt. The option decided on by Greenbelt's board of directors required petitioner to personally endorse all loans made to Greenbelt. Since petitioner was going to personally guarantee all loans made to Greenbelt, all the stockholders agreed that in fairness he should be allowed to purchase their stock.

From 1969 through 1971 petitioner made the following loans to Greenbelt:

| Year | Amount |
|---|---|
| 1969 | $6,041.14 |
| 1970 | 12,500.00 |
| 1971 | 50,861.34 |
| Total | 69,402.48 |

In March 1971, Greenbelt distributed corporate property to petitioner in partial payment of these loans. After this distribu-

tion, Greenbelt owed petitioner $35,410.35. During 1971 Greenbelt's stock and debts held by petitioner became worthless.

Throughout its existence Greenbelt derived more than 50 percent of its gross receipts from interest. Also, during its last 5 years of existence, Greenbelt's deductions (other than those claimed under sections 172, 242, 243, 244, and 245) exceeded its gross income.

## OPINION

There are three issues for our resolution: whether petitioners' loss on 20,000 shares of Greenbelt stock purchased in 1959 was a loss on section 1244 stock; whether petitioners are entitled to an ordinary loss deduction under section 165(a) for the remainder of their Greenbelt stock; and whether petitioners are entitled to claim an ordinary loss under section 166(a) for the loans to Greenbelt.

Section 1244 generally provides that a loss on section 1244 stock shall be treated to a limited extent as an ordinary loss. Section 1244(c) defines the term "section 1244 stock" by establishing certain requirements, only one of which is in issue. That requirement, found in paragraph (1)(E) of section 1244(c), provides that "section 1244 stock" means common stock in a domestic corporation if—

such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained * * * , derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities * * * ; *except that this subparagraph shall not apply with respect to any corporation if,* for the period referred to, *the amount of the deductions allowed by this chapter* (other than by sections 172, 242, 243, 244, and 245) *exceed the amount of gross income.* [Emphasis added.]

The parties agree that Greenbelt, during the 5 most recent taxable years ending before petitioner sustained his loss, derived more than 50 percent of its aggregate gross receipts from interest. Petitioner nevertheless contends that his Greenbelt stock qualifies as section 1244 stock, because the amount of Greenbelt's deductions (other than sections 172, 242, 243, 244, and 245 deductions) during Greenbelt's preceding 5 taxable years exceeded the amount of its gross income. In sum, petitioner alleges that the gross receipts test of section

1244(c)(1)(E) does not apply to his Greenbelt stock because of the exception emphasized in the above-quoted statute.

Respondent, in contrast, contends Greenbelt does not fall within the exception in section 1244(c)(1)(E). Respondent's argument, briefly summarized, is that the purpose of the gross receipts test in section 1244(c)(1)(E) is to limit section 1244 benefits to "largely operating companies." The exception to the gross receipts test is to preserve section 1244 benefits for largely operating companies that "never get off the ground." Without this exception, respondent notes, a corporation that was intended to be largely an operating corporation, yet was unsuccessful in its business, could be disqualified by the 50-percent gross receipts test if it received a small amount of passive income.

After considering both parties' arguments as well as the facts before us, we agree with respondent that petitioner's Greenbelt stock, purchased in 1959, was not section 1244 stock. Therefore, petitioners are not entitled to treat their loss on the Greenbelt stock as an ordinary loss under section 1244.

Section 1244(c)(1)(E) establishes a gross receipts test under which more than 50 percent of a corporation's gross receipts must be derived from sources other than passive income. Section 1.1244(c)–1(g)(2), Income Tax Regs., notes that the gross receipts test need not be complied with "if for the applicable period the aggregate amount of deductions allowed to the corporation exceeds the aggregate amount of its gross income." The parties have agreed that during the applicable period Greenbelt's properly allowed deductions exceeded its gross income. Because Greenbelt's deductions exceeded its gross income, petitioners contend the gross receipts requirement, on its face, does not apply to Greenbelt. We disagree.

Section 1.1244(c)–1(g)(2), Income Tax Regs., continues with a qualification of the exception to the gross receipts test:

Notwithstanding * * * [the exception to the gross receipts test], pursuant to the specific delegation of authority granted in section 1244(e) to prescribe such regulations as may be necessary to carry out the purposes of section 1244, *ordinary loss treatment will not be available with respect to stock of a corporation which is not largely an operating company* within the five most recent taxable years * * * ending before the date of the loss. [Emphasis added.]

Respondent contends this regulation was properly authorized

by section 1244(e), and further, the regulation prohibits any Greenbelt stock from qualifying as section 1244 stock. Petitioner, however, contends the Secretary has exceeded his authority in promulgating section 1.1244(c)–1(g)(2), Income Tax Regs., and contends that a company does not have to be a largely operating company if the exception to the gross receipts test is fulfilled. Accordingly, resolution of this issue hinges on whether the Secretary exceeded his authority in promulgating section 1.1244(c)–1(g)(2), Income Tax Regs., thereby imposing a largely operating company limitation over both the gross receipts test and the gross income exception found in section 1244(c)(1)(E). We conclude the Secretary properly exercised his authority.

Generally, income tax regulations must be sustained unless unreasonable. In considering the weight to be given regulations, the Supreme Court in *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948), stated:

> This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons.

This observation by the Supreme Court is especially significant in the case before us since section 1244(e) contains an extraordinary provision specifically delegating to the Secretary the authority to "prescribe such regulations as may be necessary to carry out the purposes of this section." Therefore, we must determine if section 1.1244(c)–1(g)(2), Income Tax Regs., carries out the purposes Congress attempted to achieve in section 1244(c)(1)(E).

Section 1244 originated in the House as part of H.R. 13382, 85th Cong., 2d Sess. (1958), which subsequently became title II, Small Business Tax Revision Act of 1958; Pub. L. 85–866, 72 Stat. 1676. In its original form, as passed by the House, section 1244(c)(1)(E) contained only a gross receipts test, with no gross income exception. The House Report, H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 711, explained the purpose of section 1244(c)(1)(E), as drafted when it passed the House:

> Your committee also has imposed a restriction designed to limit this tax benefit to companies which are *largely operating companies.* Thus, the corporation, in the 5 years before the taxpayer incurs the loss on the stock, must have derived more than half of its gross receipts from sources other than

royalties, rents, dividends, interest, annuities, and the sale of stock or securities. [Emphasis added.]

Clearly, the purpose of section 1244(c)(1)(E) was to limit benefits of section 1244 to shareholders of largely operating companies. Although the term "largely operating companies" was not defined, Congress described the kind of gross receipts—essentially passive receipts—that would prevent section 1244 treatment.

When H.R. 13382 was being debated on the Senate floor, the gross income exception to the gross receipts test was added to section 1244(c)(1)(E). Again, Congress indicated that section 1244 benefits were designed for shareholders in "largely operating companies" and the gross receipts restriction was enacted to help achieve that effect. 104 Cong. Rec. 17,090 (daily ed. Aug. 12, 1958).[2] Congressional history, however, goes on to say that the gross receipts restriction need not be satisfied if gross income is exceeded by allowable deductions. 104 Cong. Rec. 15,792 (daily ed. Aug. 12, 1958). In creating this exception to the gross receipts restriction, *nowhere did Congress indicate that the overall "largely operating company" limitation was to be ignored.* It merely indicated that a restriction, the gross receipts test, did not have to be complied with under all circumstances. Properly read, therefore, the gross income exception was an exception to the gross receipts test, not an exception to the overall largely operating company limitation. Accordingly, we must conclude that the Secretary, in drafting section 1.1244(c)–1(g)(2), Income Tax Regs., merely followed the purpose of Congress by limiting section 1244 benefits to shareholders of largely operating companies. We therefore disagree with petitioner's contention that the Secretary exceeded his authority in promulgating this regulation.

Given this interpretation, it becomes apparent that the exception to the gross receipts test was not intended as an exception to the "largely operating company" requirement. Rather, this exception is intended to protect section 1244 benefits for shareholders of corporations engaged in active, largely operating—although unsuccessful—business enterprises

---

[2]There is no official Senate Finance Committee report that covers sec. 1244. Senator Kerr, however, read into the Congressional Record a summary of the amendment prepared by the staff for the committee. 104 Cong. Rec. 17,089–17,092 (daily ed. Aug. 12, 1958).

which, *because of their unsuccessful nature,* derived 50 percent or more of their gross receipts from passive investments.[3]

Were we to adopt petitioner's view that the largely operating company limitation may be ignored if gross income is exceeded by allowable deductions, some extreme and illogical results would occur. For example, stock in corporations engaged in any activity—or lack of activity—could qualify for section 1244 treatment so long as the company had 5 successive loss years. As a result, shareholders in companies engaged strictly in passive investing such as purchasing and selling securities would be entitled to section 1244 treatment if the company sustained losses for 5 years. Clearly Congress did not intend to extend section 1244 benefits to shareholders of such purely passive income companies, yet petitioner's argument would require us to grant section 1244 treatment to such shareholders. Also, under petitioner's view of this statute, a shareholder in a purely passive company that sustained losses for 4 years would not be entitled to section 1244 treatment unless the company could continue its unprofitable ways. The effect of petitioner's contention would be to encourage passive income companies to continue their losses once a losing pattern had been established, so that shareholders could receive section 1244 treatment. Such a line of reasoning, however, approaches absurdity. Accordingly, we must reject petitioner's argument that section 1.1244(c)–1(g)(2), Income Tax Regs., is invalid.

Respondent's regulation and interpretation of the gross receipts test was followed in *Bates v. United States,*    F. Supp. (N.D. Ohio, Mar. 29, 1976, 37 AFTR2d 76–1090, 76–1 USTC par. 9367), affd. (6th Cir., July 21, 1978). In *Bates,* BIC

---

[3]Without an exception to the gross receipts test, stock in a corporation engaged in the manufacture of small appliances that had very small sales, and hence small gross receipts, would not qualify as sec. 1244 stock if the company had a small amount of interest income that was equal to or exceeded the company's gross receipts from appliance manufacture. In other words, without the exception to the gross receipts test, if passive income was equal to or exceeded nonpassive income, even stock in a largely operating company would not qualify for sec. 1244 treatment. The purpose of the exception to the gross receipts test is to protect sec. 1244 benefits for such operating corporations. Clearly, had the corporation's main activity, manufacturing small appliances, been more successful, gross receipts from manufacturing would have exceeded gross receipts from passive investment. Denying sec. 1244 benefits to such operating companies, because the operating or manufacturing aspect of the business proved unsuccessful would defeat the intended purpose of sec. 1244, which was "to encourage the flow of new funds into small business." H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 711. To construe the exception to the gross receipts test as expanding sec. 1244 benefits to primarily passive business operations as proposed by petitioner, however, would generally defeat Congress' intention of limiting the tax benefits to "largely operating companies."

corporation was unsuccessful and had no gross receipts of any kind. In determining whether BIC's shareholders were entitled to section 1244 losses on their stock the court noted that even though BIC had no gross receipts, its shareholders could obtain ordinary loss treatment if "BIC can qualify under the Treasury regulations as 'largely an operating company.'" The court phrased the test, "To so qualify [as largely an operating company] it is concluded that it must be shown that if gross receipts had been received * * * from BIC's corporate activities, it is probable that more than 50 percent of said gross receipts would have been derived from sources other than passive sources." Applying that test, the court concluded BIC's intended activities "could only have led to passive income." Similarly, we conclude that Greenbelt was not largely an operating company. Its primary source of gross receipts was interest. Had Greenbelt been successful, its primary source of gross receipts would have remained interest. Under these facts we must conclude Greenbelt was not largely an operating company, and hence its stock was not section 1244 stock.

We note that the effect of our decision on this issue is to prevent stock in small loan companies, such as Greenbelt, from qualifying as section 1244 stock even though the small loan company may have actively conducted its business. This position is consistent with our cases decided under subchapter S (sec. 1371–1379), an analogous area of the Code.

Subchapter S, which was enacted by the same public law that enacted section 1244, has a termination provision, sec. 1372(e)(5),[4] consisting of a gross receipts test similar in wording

---

[4]SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(e) TERMINATION.—

* * * * * * *

(5) PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

(B) Subparagraph (A) shall not apply with respect to a taxable year in which a small business corporation has gross receipts more than 20 percent of which is passive investment income, if—

(i) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year; and

(ii) the amount of passive investment income for such taxable year is less than $3,000.

(C) For purposes of this paragraph, the term "passive investment income" means gross

to section 1244(c)(1)(E). Furthermore, section 1372(e)(5)(B) contains an exception to the gross receipts test that is similar in purpose to the gross income exception found in 1244(c)(1)(E), i.e., protecting startup years. On many occasions this Court has emphasized that we will not look behind the extent of activities that generated the income. Consequently, interest income, whether earned from savings accounts or small loans, constitutes passive income and terminates subchapter S status. See, e.g., *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971, 977 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971), a Court-reviewed opinion in which we stated, "we cannot find that the nature of the income changes simply because the corporation earning it must engage in many activities and exert a great deal of effort in doing so." In *Marshall v. Commissioner*, 60 T.C. 242, 252 (1973), affd. 510 F.2d 259 (10th Cir. 1975), also a Court-reviewed opinion, we held "interest and rental income are part of 'passive investment income' even though the recipient of such interest or rental income may be actively engaged in a small loan or real estate business." Similarly, see *Zychinski v. Commissioner*, 60 T.C. 950 (1973), affd. 506 F.2d 637 (8th Cir. 1974), cert. denied 421 U.S. 999 (1975).[5]

Next we must decide whether petitioners are entitled to ordinary loss treatment on their Greenbelt stock purchased in 1968, and whether petitioners are entitled to ordinary loss treatment on the unrepaid portion of the loans made to Greenbelt. The parties agree that both stock and loans became

receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Gross receipts derived from sales or exchanges of stock or securities for purposes of this paragraph shall not include amounts received by an electing small business corporation which are treated under section 331 (relating to corporate liquidations) as payments in exchange for stock where the electing small business corporation owned more than 50 percent of each class of the stock of the liquidating corporation.

[5]Compare *Doehring v. Commissioner*, T.C. Memo. 1974–234, revd. 527 F.2d 945 (8th Cir. 1975). *Doehring* dealt with sec. 1372(e)(5) prior to its amendment in 1966. Subsequent to this amendment which revised the heading of sec. 1372(e)(5) from "Personal Holding Co. Income" to "Passive Investment Income," the Eighth Circuit, in *Zychinski v. Commissioner*, 506 F.2d 637 (8th Cir. 1974), reversed its position thereby agreeing with the Ninth and Tenth Circuits which have also affirmed this Court. *Buhler Mortgage Co. v. Commissioner*, 443 F.2d 1362 (9th Cir. 1971); *Marshall v. Commissioner*, 510 F.2d 259 (10th Cir. 1975). See also *Doehring v. Commissioner*, 527 F.2d 945, 948–949 (8th Cir. 1975), explaining why the Eighth Circuit modified its position as a result of the 1966 change in sec. 1372(e)(5). Compare *House v. Commissioner*, T.C. Memo. 1970–125, revd. 453 F.2d 982 (5th Cir. 1972), a case dealing with pre–1966 statutory language, and *Puckett v. Commissioner*, T.C. Memo. 1974–235, affd. 522 F.2d 1385 (5th Cir. 1975), also dealing with pre–1966 language in which we applied the Golsen rule but noted, "We hasten to add that this decision does not reflect the thinking of this Court on the issue resolved thereby."

worthless during 1971. The only issue, therefore, is the character of petitioners' losses.

Petitioner contends he purchased large quantities of Greenbelt stock in 1968 for $59,841.90 and subsequently loaned Greenbelt $69,402.48 in order to protect his main source of income and employment. As such, petitioner contends his dominant motivation in purchasing the stock and making the loans was not investment, but protecting his employment. Therefore, petitioner alleges he is entitled to ordinary loss treatment when the stock and loans became worthless. In making this argument petitioner relies on *Irwin v. United States*, 401 F. Supp. 547 (E.D. La. 1975), and a Memorandum Opinion of this Court, *Haslam v. Commissioner*, T.C. Memo. 1974–97.

Respondent contends that petitioner's dominant motivation in purchasing the additional Greenbelt stock and making the advances was investment and therefore petitioner is not entitled to ordinary loss treatment when the stock and loans became worthless.[6]

Generally, section 165(a) provides that uncompensated losses are deductible in the year sustained. Losses from worthless securities are normally treated as losses from the sale or exchange of capital assets. Sec. 165(g). Under the doctrine announced in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), the sale or exchange of stock may give rise to ordinary rather than capital loss if the stock was purchased and held as an integral act in the conduct of a taxpayer's business rather than purchased or held for investment purposes. *Booth Newspaper, Inc. v. United States*, 303 F.2d 916, 921 (Ct. Cl. 1962).

Similarly, section 166(a) provides that debts shall be deductible in the year they become worthless. Nonbusiness bad debts, however, are treated as a short-term capital loss. Sec. 166(d)(1). In the case of an individual, the question is whether, at the time of worthlessness, the debt has a "proximate" relationship to the taxpayer's business; whether business motivation was the dominant motivation for making and holding the loans. *United*

---

[6]Although the parties address these issues as to petitioner's dominant motivation, should we conclude petitioner had a substantial investment motive in purchasing the stock, he will not be entitled to ordinary loss treatment on the stock. See *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977).

*States v. Generes,* 405 U.S. 93, 103 (1972). If so, the loss may be an ordinary loss under section 166(a).

Petitioner's motivation is a fact question on which he has the burden of proof. *Smith v. Commissioner,* 60 T.C. 316, 318 (1973). After considering all the facts before us, the circumstances surrounding the stock purchase and subsequent loans, we conclude petitioner had a significant investment purpose in purchasing the stock, and a dominant investment purpose in making the loans.

The heart of petitioner's argument is that he purchased the Greenbelt stock in 1968 and made subsequent loans to the corporation in order to protect his primary source of income. In light of the facts, however, we find this contention incredible. From 1968 to 1971 petitioner spent more than $130,000 on stock and in loans to the corporation. During this same period his gross salary as president was between $7,200 and $12,000. We simply cannot believe that petitioner would spend so much money to protect this amount of income. Clearly, petitioner also had a significant investment motive. We are further persuaded by other facts. During the entire life of the corporation petitioner was president and a large—perhaps effectively the controlling—shareholder; from 1968 on, he was virtually the only shareholder. Under these circumstances he had little fear of losing his job as president.

Although petitioner relies on *Irwin v. United States, supra,* and *Haslam v. Commissioner, supra,* we find them unhelpful to petitioner's contentions. First, since the briefs were submitted in this case, *Irwin v. United States* has been reversed, and therefore no longer constitutes reliable authority. *Irwin v. United States,* 558 F.2d 249 (5th Cir. 1977), revg. 401 F. Supp. 547 (E.D. La. 1975). Second, the facts in *Haslam v. Commissioner* are clearly distinguishable. In *Haslam,* taxpayer had an annual salary of approximately $15,000 and invested $20,000 in the corporation. We noted that, "In our opinion, an assured salary of $15,000 per year over a period of years was a more valuable interest to petitioner than the mere possibility of recouping the already invested $20,000 * * * and the prospect of such continued employment was petitioner's dominant motivation." We cannot make such a finding here. Petitioner invested over $130,000 yet had a salary ranging between $7,200 and $12,000.

This salary was not so relatively large that we can say it was "a more valuable interest" to petitioner than his investment.

Accordingly, we conclude petitioner had a substantial investment motive in purchasing the stock and a dominant motive in loaning money to the corporation. Petitioners are therefore not entitled to ordinary loss treatment on either their worthless stock or their worthless debts.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: The parties in this case have focussed on the question whether respondent's regulation qualifying section 1244(c)(1)(E), and particularly its exception clause in respect of largely operating companies, is valid. In this focus, I have no doubt that the majority herein is correct. I reserve my position in a future case where the parties lock horns on whether a small loan company can be considered a "largely operating company" within the meaning of respondent's regulations and there is an adequate record upon which to make a determination of that issue.

RAUM and SIMPSON, *JJ.*, agree with this concurring opinion.

FEATHERSTON, *J.*, dissenting: I respectfully dissent. Section 1244(c)(1) defines the term "section 1244 stock" to mean common stock in a domestic corporation which meets certain requirements. There is no dispute that petitioner meets all these requirements except one. The disputed requirement, contained in subparagraph (E), is that the corporation, during its 5 most recent taxable years ending before the date the loss is sustained (or such lesser period as the corporation is in existence), "derived more than 50 percent of its aggregate gross receipts from sources other than * * * interest," etc. (hereinafter the gross receipts test). Section 1244(c)(1)(E) provides the exception, however, that "this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the

deductions allowed by this chapter (other than * * * [those allowed by specified sections]) exceed the amount of gross income" (hereinafter the except clause).

In the instant case, the income of Greenbelt, petitioner's corporation, was derived from interest on loans, but its deductions exceeded its gross income during the relevant period. Therefore, in my opinion, the interest limitation in section 1244(c)(1)(E) does not apply, and petitioner's stock qualifies as section 1244 stock. His loss should be given ordinary treatment.

The majority has denied ordinary treatment of petitioner's loss by relying upon the following sentences of section 1.1244(c)–1(g)(2), Income Tax Regs.:

Notwithstanding the provisions of this subparagraph [i.e., the except clause] and of subparagraph (1) [the gross receipts test] of this paragraph, pursuant to the specific delegation of authority granted in section 1244(e) to prescribe such regulations as may be necessary to carry out the purpose of section 1244, ordinary loss treatment will not be available with respect to stock of a corporation which is not largely an operating company within the five most recent taxable years (or such lesser period as the corporation is in existence) ending before the date of the loss.

The majority concludes that petitioner's automobile finance company was not "largely an operating company" and, therefore, its stock was not section 1244 stock. I disagree.

While the trial record leaves much to be desired, it contains evidence which shows, or from which it may be inferred, that the corporation received applications for loans, made credit investigations, made loans on automobiles, took liens to secure those loans, discounted its paper at four different banks to raise additional funds for loans, collected the loan installments, repossessed its security for delinquent accounts, sold foreclosed automobiles, and applied the proceeds of those sales to indebtedness owed the corporation. In my opinion, such activities show that Greenbelt was "largely an operating company."[1]

The purpose of section 1244 is to encourage the flow of funds into small business by allowing losses incurred by shareholders on the failure of small corporations to be treated in the same

---

[1] While most of petitioner's brief is devoted to arguing the language of sec. 1244(c)(1)(E), his brief contains the following argument:

"Greenbelt Finance, Inc., was an operating company from its inception in 1959 until its failure in 1971."

I do not think we can properly ignore this argument.

manner as losses incurred by partnerships and sole proprietorships.[2] The disputed regulation can be sustained as a measure to achieve that end. The regulation so interpreted would deny ordinary loss treatment of a shareholder's losses in respect of a corporation's stock if the corporation's losses were attributable largely to investment rather than business transactions. Indeed, the sentences in the regulation which follow the ones quoted above illustrate the "largely an operating company" requirement in those terms. In no circumstances, however, does the regulation reach the losses of an automobile finance company like Greenbelt.

To disqualify petitioner's stock in Greenbelt as section 1244 stock, the majority introduces a "passive income" concept which is foreign to both the language and legislative history of section 1244. Under that concept, as I understand it, all interest income is classified as passive income, and the stock of any corporation engaged in producing interest income is, as a matter of law, deprived of qualification as section 1244 stock. This interpretation of the regulation, in my opinion, places it at odds with the statute and if that is what the regulation means, it is invalid.

In laying down the gross receipts test of section 1244(c)(1)(E), Congress spoke specifically to the effect of the receipt of interest income, i.e., for the corporation to have section 1244 stock, more than 50 percent of its gross receipts must be derived from sources other than interest, etc. Further, Congress specifically provided that the gross receipts test does *not* apply if the corporation's deductions exceed its gross income during the corporation's most recent 5 years or such lesser period as the corporation is in existence. Where Congress has focused on a subject, such as the effect interest income has on section 1244 stock qualification, and prescribed a statutory rule, the Treasury Department's authority, notwithstanding the specifically grant-

---

[2]The general purpose of Code sec. 1244 is explained in H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 711, and the "summary of the amendment" in almost identical language. The "summary of the amendment" states:

"This provision is designed to encourage the flow of new funds into small business. The encouragement in this case takes the form of reducing the risk of a loss for these new funds. The ordinary loss treatment which the bill accords shareholders in small corporations in effect is already available to proprietors and partners. They report directly the earnings from these business ventures and thus ordinary losses realized by a proprietorship or partnership presently constitute ordinary losses to the proprietor or partner. As a result, from the standpoint of risk taking, this amendment places shareholders in small corporations on a more nearly equal basis with proprietors and partners."

ed section 1244(e) power to prescribe regulations, does not permit it to add a requirement which abrogates the statutory rule. That is what the regulation, as interpreted by the majority, does.

The majority quotes from H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959-2 C.B. 709, 711, to sustain its conclusion. But the House version of section 1244 which that committee report undertakes to explain was not enacted. The House version did not contain the "except clause" which is part of section 1244(c)(1)(E) as enacted. The House Report, therefore, is not a reliable guide to the meaning of the statute.

There was no Senate committee report on section 1244. Senator Kerr introduced what became section 1244 as an amendment to a bill under consideration on the Senate floor. He inserted in the Congressional Record, vol. 4, p. 17,090 (daily ed. Aug. 12, 1958), a "summary of the amendment" which explained the "largely an operating company" requirement in terms of the gross receipts test and the "except clause" as follows:

> Also, a *restriction* has been imposed which is designed to limit this tax benefit to shareholders in companies which are largely operating companies. Thus, the corporation, in the 5 years before the taxpayer incurs the loss on the stock (or for the period of its existence if less than 5 years) must have derived more than half of its gross receipts from sources other than royalties, rents, dividends, interest, annuities, and the sale of stock or securities. *This restriction is to apply, however, only if the gross income equals or exceeds deductions (ignoring the net operating loss carryforward or back and the deductions for partially tax exempt interest and dividends received).* [Emphasis added.]

This explanation of the test to be applied in respect of interest and similar items, in my opinion, forbids the imposition of a further test based on a passive income concept.

I am aware of this Court's opinions, cited by the majority, which apply section 1372(e)(5), headed "Passive Investment Income." Those opinions read section 1372(e)(5) literally and hold that, if more than 20 percent of a corporation's income consists of interest, it is not eligible to make the subchapter S election regardless of what operations were required to earn the interest. See *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971, 977–979 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971); *Marshall v. Commissioner*, 60 T.C. 242, 251 (1973), affd. 510 F.2d 259, 264 (10th Cir. 1975), which emphasize the "plain meaning" or the "clear language" of section 1372(e)(5). That section, however,

does not contain an "except clause" similar to the one appearing in section 1244(c)(1)(E), and if section 1244(c)(1)(E), including the "except clause," is given the same literal reading as the above-cited cases give section 1372(e)(5), petitioner's Greenbelt stock clearly is section 1244 stock. I think section 1244(c)(1)(E) means what it says, and the interpretation which the majority gives the regulation to make it symmetrical with the section 1372(e)(5) cases does violence to the language of section 1244(c)(1)(E) and has no foundation in that section's legislative history or purpose.

I would allow ordinary treatment of petitioner's loss.

DRENNEN, FAY, STERRETT, GOFFE, and HALL, *JJ.*, agree with this dissenting opinion.

WILBUR, *J.*, dissenting: I agree with Judge Featherston that petitioner was "largely an operating company" within the meaning of section 1.1244(c)–1(g)(2), Income Tax Regs., and that language differences in sections 1371 and 1244 make it unnecessary to frustrate the basic purposes of section 1244 by applying precedents that interpret section 1371 in an extremely literal manner.

Nevertheless, both sections 1371 and 1244 were enacted contemporaneously, both are designed to assist small business, and both employ identical language to disqualify corporations with excess receipts from sources other than "royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities." Sec. 1244(c)(1)(E) and sec. 1371(e)(5). It is not wholly unreasonable, therefore, for the majority to attempt to harmonize the precedents interpreting the words "royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities" that are common to both sections. However, in implicitly adopting this objective the majority should have reexamined these precedents[1] to determine whether they are

---

[1] *Marshall v. Commissioner*, 60 T.C. 242 (1973), affd. 510 F.2d 259 (10th Cir. 1975); *Zychinski v. Commissioner*, 60 T.C. 950 (1973), affd. 506 F.2d 637 (8th Cir. 1974), cert. denied 421 U.S. 999 (1975); *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971). Contra, *Doehring v. Commissioner*, 527 F.2d 945 (8th Cir. 1975), revg. a Memorandum Opinion of this Court; *Puckett v. Commissioner*, 522 F.2d 1385 (5th Cir. 1975), affg. a Memorandum Opinion of this Court; *House v. Commissioner*, 453 F.2d 982 (5th Cir. 1972), revg. a Memorandum Opinion of this Court. See also contra, *Valley Loan Ass'n. v. United States*, 258 F. Supp. 673 (D. Colo. 1966).

Some of these decisions hold against the taxpayer by suggesting that a conforming change in the heading of subpar. 1372(e)(5) from "Personal Holding Company Income" to "Passive Investment

directly applicable, consistent with each other, or adequately reflect the purposes of section 1244. I believe those precedents were erroneous to begin with, and if the majority believes they cannot be distinguished, they should be overruled.

*Marshall v. Commissioner,* 60 T.C. 242 (1973), affd. 510 F.2d 259 (10th Cir. 1975), will suffice to illustrate the point. In *Marshall,* we held that "interest and rental income are part of 'passive investment income' even though the recipient of such interest or rental income may be actively engaged in a small loan or real estate business." 60 T.C. at 252.[2] We relied on the following quote (somewhat out of context) from *Buhler Mortgage Co. v. Commissioner,* 51 T.C. 971, 978 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971):

> We conclude that the test established is one which requires us to look only to the plain meaning of the words used to define the income, not to the activity required to produce it. * * *

These statements in *Marshall* and *Buhler* are clearly in error. The regulations under both sections 1371 and 1244 make it clear that the nature and extent of the underlying activity producing the income—not just the income itself—must be examined in light of the legislative purpose. For example, payments for "the use or occupancy of rooms or other space where significant services are also rendered to the occupant" are excluded from the term rent by the regulations under both sections, which go on to explain:

> Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those *usually or customarily rendered in connection with the rental of rooms or other space for occupancy only.* The supplying of maid service, for example, constitutes such services;

---

Income" was intended to completely alter the results in the case before us. Aside from the difficulty of such a reading, Congress made it as clear as the English language permits that no such change was intended. In S. Rept. 89–1007, U.S. Code Cong. & Adm. News 2141, 2160 (1966), Congress stated "Subparagraph (C) defines the term 'passive investment income' to mean the *same gross receipts* as are taken into account under existing law." (Emphasis added.) Respondent agrees with this interpretation. See *Doehring v. Commissioner,* 527 F.2d 945, 948 n. 8 (8th Cir. 1975). We may safely assume that this is the position of the Fifth Circuit, to which this case is appealable, see *House v. Commissioner, supra* at 987 ("neither did the interest earned by a small loan company fit the words 'passive investment income'"); and *Puckett v. Commissioner, supra.* If the cases cited in this footnote are, as the majority implies, the dispositive precedents, the spirit if not the letter of *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), requires that we sustain the taxpayer.

[2]In affirming our opinion the Court of Appeals made essentially the same statement—"the clear language of Section 1372(e)(5) * * * enumerates 'interest' as a *per se* form of 'passive investment income.'" *Marshall v. Commissioner,* 510 F.2d at 264.

whereas the furnishing of heat and light, the cleaning of public entrances, exits, stairways, and lobbies, the collection of trash, etc., are not considered as services rendered to the occupant. Payments for the use or occupancy of entire private residences or living quarters in duplex or multiple housing units, of offices in an office building, etc., are generally "rents" under section 1244(c)(1)(E). * * * [Sec. 1.1244(c)–1(g)(1)(iii), Income Tax Regs.; see also sec. 1.1372–4(b)(5)(vi), Income Tax Regs. Emphasis added.]

These regulations carefully examine the nature and extent of the underlying economic activity in the light of the related legislative purpose. Unless these regulations are invalid, our position in *Marshall* that "rent and interest" are passive income per se regardless of the nature and intent of the underlying activities is clearly wrong.[3]

While the regulations do not define interest, the statute lumps "royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities" together. These terms are united by the congressional purpose they were employed to implement. If one of the terms is a "per se" term, they all are, and vice versa. A common policy underlies all the words, and under the principle of noscitur a sociis, a common principle of construction should be applied.

Additionally, the majority recognizes that the provisions of the regulations confining the benefits of section 1244 to operating companies cannot be found within the language of the statute. After a careful analysis of the purpose of the statute, the majority upholds the regulation on the ground that Congress, in using the words "royalties, rents, dividends, interest, annuities, and sales or exchange of stock or securities," intended to provide the benefits of section 1244 to operating companies, and deny the benefits to nonoperating companies. That is, these words were intended to permit operating companies (and only operating companies) to qualify for section 1244 treatment.

As noted, the regulations make it clear that rents can be produced by an operating company (renting personal property or an apartment with ancillary services) or by a nonoperating company (rental of space for occupancy only). Rental income can

---

[3]Indeed, the regulations make it clear that the term "rent" includes payments "for the use of, or right to use, property (whether real *or personal*)." (Emphasis added.) Sec. 1.1244(c)–1(g)(1)(iii), Income Tax Regs. If rent is passive income per se, presumably it includes rental income from leasing cars, medical equipment, tools, or furniture. Acme Car Rental and Abbey Rents, both competitive businesses incurring considerable business risks, would not qualify under either sec. 1371 or sec. 1244.

fall on either side of the line depending on whether the income is generated by an operating company or by passive investment activities. Similarly, the companion term interest can fall on either side of the line. Since "rent or interest" may be produced either by an operating company or a nonoperating company (one engaged in passive investment activities) these items are not, as *Marshall* wrongly held, always passive income (passive income per se).[4]

*Marshall*, already sinking from the weight of its own error, cannot resurface in the 1244 area, for the words "operating company" simply cannot be circumnavigated. They represent an obstacle that cannot be submerged. Thus, we are unanimous in our agreement that the statute was intended to benefit "operating companies." But how can we determine which companies qualify as "operating companies" without looking at operations? Certainly we cannot do it by looking "only to the plain meaning of the words used to define the income, not to the activity required to produce it." *Buhler Mortgage Co. v. Commissioner, supra* at 978; *Marshall v. Commissioner, supra* at 251. We cannot be mesmerized by the appellation routinely applied to the income, but by definition must look at operations to determine whether we have an "operating company."

Further examples abound, but one more from the regulations will suffice. The regulations, in discussing the operating company limitation, contain the following example:

Thus, for example, assume that a person who is not a dealer in real estate forms a corporation which issues stock to him which meets all the formal requirements of section 1244 stock. The corporation then acquires a piece of unimproved real estate which it holds as an investment. The property declines in value and the stockholder sells his stock at a loss. The loss does not qualify for ordinary loss treatment under section 1244 but must be treated as a capital loss. [Sec. 1.1244(c)–1(g)(2), Income Tax Regs.]

---

[4] In *Marshall*, we specifically noted (60 T.C. at 251) that *House v. Commissioner*, 453 F.2d 982 (5th Cir. 1972), reversing a Memorandum Opinion of this Court, overlooked the following statement from our *Buhler Mortgage* opinion:

"The standard used by the Code and the regulations does not permit us to look behind normal characterizations of a corporation's receipts in order to classify them as active or passive. If this were not so, we can only guess at what criteria might be properly used to say, e.g., that a rent item was "active" because the tenant was such poor pay. * * * "

Simply reading the regulations would have obviated the necessity of guessing about the criteria to be applied to rent—it is spelled out there in considerable detail. Presumably the Fifth Circuit read the regulations and this may explain why, in the words of *Marshall* (60 T.C. at 252) our position "cannot be reconciled with the holding of the Fifth Circuit in *House v. Commissioner, supra.*"

Obviously, the corporation in this example is not disqualified by "the plain meaning of the words used to define income," for the corporation has none of the forbidden income. Rather it is disqualified by "the activity required to produce" the income, and the quote from *Buhler Mortgage Co. v. Commissioner, supra,* that set all this mischief in motion is therefore once more squarely at odds with the language of the regulations. But *Buhler* and *Marshall,* relied on so heavily by the majority, pretty much ignored the anomaly of sustaining respondent on arguments at war with his own regulations. And of course these cases were so enamored with "plain meaning" (that weary substitute for hard thought) that very little attention was directed towards legislative intent and the purpose of the statute.

In the final analysis, the regulation, in using the term operating company, was designed to limit the availability of section 1244 to small corporations operating an *active* business, and deny its availability to companies engaged essentially in *passive* investment activities. The regulations thus give a reading to the statute consistent with the remedial purpose Congress had in mind. Congress explained this purpose as follows:

> This provision is designed to encourage the flow of new funds into small *business.* The encouragement in this case takes the form of reducing the *risk* of a loss for these new funds. The ordinary loss treatment which the bill accords shareholders in small corporations in effect is already available to proprietors and partners. They report directly the earnings from these *business* ventures and thus ordinary losses realized by a proprietorship or partnership presently constitute ordinary losses to the proprietor or partner. As a result, from the standpoint of *risk taking,* this bill places shareholders in small corporations on a more nearly equal basis with proprietors and partners. [H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959-2 C.B. 709, 711. Emphasis added.]

Congress wanted to assist small businesses "from the standpoint of *risk taking,*" to encourage them to incur "the *risk* of loss" that a businessman always evaluates in beginning a new enterprise. The income-producing activities and the income produced by small businesses must be examined from the standpoint of *business risk*—do we have a coupon clipper or an entrepreneur? The regulations do this by referring to operating companies. They do it again by disqualifying real estate investment companies even though these companies realize none of the specific forms of forbidden income. And they do it again in defining "rent" by distinguishing between space passively

leased for occupancy only (where the rent check is simply picked up at the mailbox), and active rental activities also involving the provisions of services (i.e., maid, security, recreation, and other ancillary services in a luxury apartment). Congress had no different objective in mind in using the term "interest" than in using the term "rent," or the term "dividends," or the term "annuities." It simply sought to draw the line between "operating companies" and those engaged in passive investment activities on the basis of business risk.[5] The regulations, in focusing on the term *operating* company," give a meaning to the specific words in issue that reflects the policy of the statute as clearly revealed in the legislative history.

By any reasonable interpretation Greenbelt was an operating company. Petitioner incorporated business activities similar to those he had engaged in for years to earn his living. As Judge Featherston points out, from a careful reading of all the documents (including the income tax returns), we know or may infer that Greenbelt—

received applications for loans, made credit investigations, made loans on automobiles, took liens to secure these loans, discounted its paper at four different banks to raise additional funds for loans, collected the loan installments, repossessed its security for delinquent accounts, sold foreclosed automobiles, and applied the proceeds of those sales to indebtedness owed the corporation.[6]

Petitioner had made his living by performing services in this business for years. He simply organized a small business to go out on his own, exercising precisely the kind of initiative section 1244 was specifically designed to encourage. It must come as a rude shock to the ordinary man to learn that, when this operation is run through the rigors of legal learning, it is no longer an operation. If Mr. Davenport had been apprised of this earlier, he would have been saved time and grief. He could

---

[5]Probably the principal reason why this limitation on *passive investment income* was adopted was to reduce the incentive to incorporate one's *investment* activities merely to obtain tax deferral benefits accorded to pension, profit-sharing, and similar plans. * * * [S. Rept. 91–1535 (1970), 1971–1 C.B. 614. Emphasis added.]

[6]It is worth noting that if petitioner's business was "operated" as a sole proprietorship, he would pay the self-employment tax on the "interest" received (after business deductions). If he were 65, the "interest" (after business deductions) would reduce his social security benefits under the "earnings" limitation (unlike investment interest). And certainly the "interest" would *not* qualify for the retirement income tax credit. (While the retirement income tax credit has been radically amended, sec. 37(d) retains the definition of retirement income (annuities, interest, rents, dividends) for certain purposes). How then can this same interest be "passive income *per se*"?

simply have stayed home and clipped coupons; no doubt he would still have his money.

DRENNEN and GOFFE, *JJ.,* agree with this dissenting opinion.