ROBERT SCHWARTZ AND PEGGY ANN SCHWARTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket No. 2047-93.
United States Tax Court
T.C. Memo 1995-415; 1995 Tax Ct. Memo LEXIS 417; 70 T.C.M. (CCH) 526; August 24, 1995, Filed *417 Decision will be entered under Rule 155. Phil H. Leone, for petitioners. William S. Garofalo and Frank A. Racaniello, for respondent. BEGHE, Judge BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies of $ 72,436, $ 16,652, and $ 679 in petitioners' 1986, 1987, and 1988 Federal income taxes, respectively. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The term "petitioner" refers to Robert Schwartz. On November 16, 1990, petitioners filed a Form 1045, Application for Tentative Refund, on which they carried back a net operating loss from 1989 to 1986, 1987, and 1988. Respondent's disallowance of various ordinary losses claimed on petitioners' 1989 Federal income tax return has eliminated petitioners' claimed net operating loss. After concessions, the issues for decision are: (1)(a) Whether Remark Industries, Inc. (Remark), was "largely an operating company", and if it was, (b) the amount of ordinary loss allowed under section 1244; (2) whether petitioner's advances to M. Kramer Manufacturing Co., Inc. (Kramer), *418 were contributions to its capital, whether the advances were primarily motivated by petitioner's business of being an employee so that losses on those transactions would be ordinary losses under section 166(a), and whether the advances became worthless in 1989; and (3) similar questions arising under petitioner's payment under his guarantee of a bank loan to Kramer. We hold that Remark was largely an operating company and that petitioners are entitled to an ordinary loss of $ 50,000 under section 1244. Inasmuch as we hold that the advances to Kramer did not become worthless in 1989, we need not decide their character. We hold further that petitioner's personal guarantee of the bank loan was not a contribution to capital, but that petitioner's primary motive for guaranteeing the bank loan was not petitioner's business of being an employee, so that petitioners are not entitled to a business bad debt deduction for the payment under the guarantee. FINDINGS OF FACT The parties have stipulated some of the facts, and the stipulations of fact and attached exhibits are incorporated in this opinion. Petitioners resided in Normandy, New Jersey, when they filed their petition. Petitioner *419 graduated from the University of Vermont in 1964 with a bachelor of science degree in economics. After college, he started work as a cost analyst for a small manufacturing company and advanced to plant manager. In 1972, petitioner accepted the position of president of a startup company, American Medical Corp., whose main product was to be a kidney dialysis machine. By 1980, petitioner had taken American Medical from one employee to 350 employees, and from zero revenues to almost $ 40 million per year. Petitioner owned approximately 15 percent of the stock of American Medical. In 1980, 10 percent of the stock of American Medical was sold in an initial public offering. In 1982, Delmed, Inc., acquired all the stock of American Medical, and petitioner received Delmed stock and stock options having a value of approximately $ 4 million. In May 1982, petitioner stopped working for American Medical. From 1972 through 1982, petitioner's sole source of earned income had been his salary from American Medical, and, during that time, he had earned approximately $ 125,000 per year. Although petitioner did not leave American Medical until May 1982, he purchased a real estate brokerage firm in *420 1978. After petitioner left American Medical, he purchased another real estate brokerage firm and started several others. By summer 1989, petitioner no longer owned any interest in the real estate brokerage firms. After leaving American Medical, petitioner also invested in, and advised, several emerging medical-technology companies. During 1983, petitioner came to believe that there was a business opportunity in the manufacture and sale of "video lottery" machines. Video-lottery machines allow a player to play the typical games of chance found in a casino, e.g., poker and blackjack, against a machine. In February 1984, petitioner became aware of Kramer, which manufactured and sold video and nonvideo machines for use in amusement parks but had no experience with video-lottery machines. On August 15, 1984, petitioner incorporated Remark in New Jersey to become a licensed manufacturer and operator of video- lottery equipment. [1] On August 30, 1984, Remark purchased all the stock of Kramer to provide a manufacturing facility for Remark's video products. The net purchase price was $ 2,732,601, and Remark paid $ 50,000 in cash and gave two notes, one for $ 1,950,000 (later reduced by *421 $ 155,399 as an adjustment to the purchase price) and the other for $ 888,000. Remark also agreed to pay $ 1,575,000 to the sellers for their covenants not to compete. At all relevant times, petitioner owned 100 percent of the stock of Remark. Remark properly followed the formalities for designation of its stock issued to petitioner as "section 1244 stock ". Petitioner capitalized Remark with $ 50,000, which he paid directly to the sellers of the Kramer stock. Petitioner also pledged 100,000 shares of Delmed stock as collateral for a $ 1 million line of credit to Remark from the First National Bank of Toms River (FNB). For purposes of this proceeding, the parties *422 have agreed that petitioner's basis in the pledged Delmed stock was $ 56,000. Petitioner attempted to position Remark to grow with the emerging video-lottery business; he expected that it would take from 3 to 7 years before Remark would become profitable. After incorporation, Remark leased facilities, in which it had its office, warehouse, and assembly (but no manufacturing) facilities. Remark provided information and suggestions to the lottery commissions of Oregon, South Dakota, North Dakota, Minnesota, and Nebraska concerning development of laws regulating video-lottery machines. Remark acquired the rights to several electronic gaming machines and related technologies, including a "heart stress machine", a trivia game, a punch board game, and debit card technology. Remark became a licensed gaming machine manufacturer in the State of Washington, and its equipment was approved by the Nebraska lottery commission. Remark and an independent operating company test marketed a video-lottery machine in Nebraska. Remark hired a marketing director to develop Remark's identity among State lottery commissioners but did not hire any other full-time, permanent employees. Remark occasionally *423 did hire part-time employees to assemble electronic punch boards. However, Kramer manufactured all the video-lottery machines. On January 4, 1985, FNB lent Kramer $ 585,000, which was used to pay purchase price liabilities to the former owners of Kramer. The loan was payable on demand and was secured by all the accounts receivables and inventory of Remark and Kramer, 335,000 shares of Delmed stock owned by petitioner (including the 100,000 shares previously pledged), and petitioner's guarantee. On March 22, 1985, FNB lent Kramer $ 55,000. The loan was payable in 30 days and was secured by petitioner's guarantee. The loan was rolled over for 30 days on April 22, 1985, and for 60 days on May 22, 1985. On October 25, 1985, FNB lent $ 1 million to Remark and $ 400,000 to Kramer to refinance their existing loans and increase their working capital. The loans were to be repaid over 5 years with interest at FNB's prime rate plus 1 percent. The loan to Remark was secured by the accounts receivable, inventory, and contract rights of Remark, the same 335,000 shares of Delmed stock that were previously pledged, and petitioner's guarantee. The loan to Kramer was secured by the accounts receivable,inventory, *424 machinery, equipment, vehicles, furniture, fixtures,and leasehold improvements of Kramer, and petitioner's guarantee. Later, FNB lent Remark an additional $ 195,000. The date and repayment terms of this loan are not in the record, but the loan was guaranteed by petitioner. Shortly after May 31, 1986, in order to help alleviate Kramer's cash-flow problems, petitioner reduced from $ 300,000 to $ 150,000 the annual salary he had initially set for himself as the chief executive officer of Kramer. On November 11, 1986, Kramer borrowed $ 37,000 from the National Community Bank (NCB) in order to purchase a delivery truck. The loan was secured by a purchase money security interest in the delivery truck and petitioner's guarantee. In 1987, Kramer borrowed $ 750,000 from Chemical Bank. The repayment terms of this loan are not in the record, but the loan was secured by Kramer's assets, petitioners' principal residence in Normandy Beach, New Jersey, a vacant lot owned by petitioners in Brielle, New Jersey, and petitioner's guarantee. On or about April 4, 1988, FNB notified Remark that its October 25, 1985, loan was in default and demanded payment of the outstanding balance ($ 950,000) and *425 accrued interest ($ 71,014). At about the same time, the Montana and South Dakota lottery commissions approved Remark's video-lottery machines and were about to legalize video-lottery gambling. Although Remark and Kramer projected $ 9.6 million of gross receipts for the fiscal year ended May 31, 1989, they needed large amounts of additional capital to produce and warehouse the video-lottery machines they would need to take advantage of the legalization of video gambling in Montana and South Dakota. In addition, Kramer had developed a popular new electronic-amusement machine that was back ordered, and Kramer needed additional capital to produce enough machines to satisfy the demand. During 1988, Remark and Kramer applied to Chemical Bank and FNB for $ 2.7 million of long-term financing. The financing was to be used to refinance the existing loans and provide approximately $ 1 million of additional working capital. During June 1988, representatives of Chemical Bank gave petitioner, Remark, and Kramer oral assurances that the bank would approve the requested financing but said that it would take approximately 90 days to close the transaction. In anticipation of the debt restructuring, *426 petitioner advanced Kramer $ 200,000, $ 100,000, and $ 100,000 on July 15, July 29, and August 23, 1988, respectively. In exchange for each advance, Kramer gave petitioner a note that was due in 120 days with interest at Marine National Bank's prime rate plus 1-1/2 percent. Petitioner expected that his advances to Kramer would be repaid from the proceeds of the anticipated $ 2.7 million financing from Chemical Bank. Petitioner's advances were secured by Kramer's inventory, accounts receivable, equipment, copyright registrations, patent application, computer hardware and software used in the manufacture and sale of Kramer's games, rights to receive payments and other rights arising from a court order, Kramer Manufacturing Co. v. Andrews, No. 83-1344-3 (D.S.C., June 16, 1986), and all general intangibles. Petitioner believed that his advances were secured by assets different from those that secured the bank loans. Ultimately, both banks rejected Remark's and Kramer's applications for financing and began collection actions on the earlier loans and petitioner's personal guarantees. On or about January 20, March 25, and July 5, 1989, petitioner wrote letters to Remark notifying it *427 that his three notes from Kramer were in default and demanding payment of the face amounts ($ 400,000) and interest. Petitioners deducted $ 400,000 as a business bad debt on their 1989 Form 1040. On July 14, 1989, Remark and Kramer filed a petition with the U.S. Bankruptcy Court, District of New Jersey, for protection under chapter 11 of the Bankruptcy Code. On November 26, 1989, Remark's bankruptcy case was converted to chapter 7, and on March 30, 1990, Kramer's bankruptcy case was converted to chapter 7. On July 22, 1989, FNB filed suit against petitioner and Remark for the balance and interest due on its loans to Remark. On October 27, 1989, petitioner and Remark filed an answer and counterclaims against FNB. During 1989, petitioner made no payments under his guarantee of FNB's loans to Kramer, and petitioners claimed no deduction for 1989-with respect to them. On January 22, 1992, the FDIC as receiver of FNB was substituted as plaintiff, and on May 19, 1992, summary judgment was entered against petitioner and Remark. On August 18, 1989, Kramer was in default on its $ 37,000 delivery-truck loan from NCB, and NCB withdrew $ 2,584 from petitioners' account as payment under petitioner's *428 guarantee of the loan. Petitioners deducted the $ 2,584 payment as a business bad debt on their 1989 Form 1040. During 1989, petitioner made no other payments under his guarantee of NCB's loan to Kramer. By December 31, 1989, the common stock of Remark had become worthless. On petitioners' 1989 Form 1040, they claimed an ordinary loss of $ 462,500, which they characterized as a loss on section 1244 stock. On or about April 19, 1990, petitioners commenced an adversary action in the bankruptcy court to enforce petitioner's security interests in the intangible assets of Kramer. In 1992, decision was entered against petitioners. Selected financial information for Remark is as follows: May 31, 1985
May 31, 1986
May 31, 1987
May 31, 1988
Gross receipts
$ 75,000
$ 326,721
$ 23,423 -0-   Cost of goods sold
[1]
178,758
240,820 $ 17,218 Gross profit/(loss)
[1]
147,963
(217,397)
(17,218)
Interest income
[1]
19,100
12,847 -0-   Gross rents
[1]
10,200
-0-   -0-   Gross royalties
[1]
119,411
29,675 -0-   Salaries and wages
[1]
29,775
60,000 12,500 Accounts receivable
8,768
12,427
3,013 -0-   Inventory
79,659
229,687
15,901 -0-   *429 Selected financial information for Kramer is as follows: May 31, 1985
May 31, 1986
May 31, 1987
May 31, 1988
Gross receipts
$ 4,258,879
$ 5,872,134
$ 8,571,074
$ 6,309,980
Cost of goods sold
2,838,530
4,267,552
5,779,911
4,881,797
Gross profit/(loss)
1,420,349
1,604,582
2,791,163
1,428,183
Interest income
-0-  13,879
5,370
1,102
Officer compensation
455,556
461,624
213,958
280,790
Salaries and wages
616,256
429,701
709,218
643,556
Net accounts
329,771
557,329
1,077,712
435,996
receivable
Inventory
444,252
487,163
1,522,866
1,450,328
ULTIMATE FINDINGS OF FACT Remark was "largely an operating company" within the meaning of section 1.1244(c)-1(e)(2), Income Tax Regs., and petitioner's basis allocable to Remark's section 1244 stock was $ 50,000. On December 31, 1989, petitioners had a reasonable prospect of recovering the intangible assets that secured petitioner's advances to Kramer. Petitioner's payment on his guarantee of Kramer's $ 37,000 delivery-truck loan from NCB was not a contribution to capital. Petitioner's dominant motive when he guaranteed the loan was not to protect his salary. OPINION Issue 1. Section 1244 *430 Loss
Generally, if a taxpayer holds stock of a corporation as a capital asset and the stock becomes worthless, the taxpayer is entitled to deduct the adjusted basis in the stock as a capital loss, subject to the limitations of section 1211. Secs. 165(g), 1011. Section 1211 allows a noncorporate taxpayer to deduct capital losses only to the extent of the lesser of $ 3,000 or the excess of capital losses over capital gains. Sec. 1211(b). Although unused capital losses can be carried over to succeeding years, sec. 1212(b), an immediate and full deduction for ordinary losses generally produces a greater tax benefit than capital loss treatment. Section 1244 provides such a benefit, albeit on limited terms. [2]
*431 An individual who suffers what would otherwise be a capital loss on "section 1244 stock" is allowed to treat up to $ 50,000 ($ 100,000 in the case of a joint return) of the loss as an ordinary loss. Sec. 1244(a), (b) and (d)(1)(B). Only stock in relatively small domestic corporations that are engaged in an active business qualifies as section 1244 stock. Section 1244 was not intended to provide a vehicle for favorable tax treatment of losses suffered on passive investments or investments in large enterprises. Its purpose was to offer an incentive for investment of new funds in small businesses. * * * The purpose of * * * [the statutory predecessor of section 1244(c)(1)(C))] was to prevent a mere investment entity or holding company from qualifying. * * * [Bates v. United States, 581 F.2d 575, 580 (6th Cir. 1978).]
To prevent the stock of an investment or holding company from qualifying as section 1244 stock, section 1244(c)(1)(C) requires a corporation that has been in existence for less than 5 years to have derived more than 50 percent of its aggregate gross receipts from sources other than passive income. Davenport v. Commissioner, 70 T.C. 922, 926 (1978). *432 The gross receipts requirement does not apply to a corporation whose aggregate deductions (other than those allowable under section 172 and sections 243 through 245) have exceeded its gross income. Id. However, even if the gross receipts requirement does not apply, section 1.1244(c)-1(e)(2), Income Tax Regs., requires the corporation to be "largely an operating company" for its stock to qualify as section 1244 stock. Id. at 928-929. The parties agree that Remark's aggregate deductions exceeded its gross income, and that, if Remark was "largely an operating company", petitioner's common stock in Remark qualifies as section 1244 stock so that petitioners are entitled to at least a $ 50,000 ordinary loss in 1989. The disputes are whether Remark was largely an operating company, sec. 1.1244(c)-1(e)(2), Income Tax Regs., and whether, when Remark's common stock was issued, petitioner's basis in that stock was more than $ 50,000 for the purposes of section 1244, see sec. 1.1244(d)-2(a), Income Tax Regs.
(a) Whether Remark Was Largely an Operating Company
To establish that Remark was largely an operating company, petitioners must show that, if Remark *433 had been successful, it probably would have derived more than 50 percent of its gross receipts from other than passive sources. Davenport v. Commissioner, supra, at 930 (citing Bates v. United States, supra). Respondent asserts that petitioner's testimony in a prior lawsuit and Remark's lack of operating assets, minimal salaries, and insignificant sales demonstrate that Remark was primarily a holding company for Kramer. Respondent goes on to assert that, contrary to petitioner's portrayal of Remark as an operating company organized to separate gambling operations from amusement operations, Remark was organized primarily to avoid the direct- acquisition requirement of section 1244(c)(1)(B) and the $ 1 million limitation of section 1244(c)(3)(A). Petitioner's answers to questions at a deposition and to written interrogatories in the prior lawsuit, FDIC v. Schwartz, No. 2712 (D.N.J., May 19, 1992), are inconsistent with his position in this case. At petitioner's deposition, he testified that Remark "was a holding company" that did nothing other than own Kramer, and that Remark was organized to acquire Kramer *434 "primarily for tax reasons". In petitioner's answers to interrogatories he stated: "Remark Industries was setup [sic] for the sole purpose to acquire Kramer Manufacturing Co, Inc. Remark Industries had no assets whatsoever and was purely a shell corporation." We have given little weight to petitioner's conflicting testimony of his intent with respect to Remark's expected operations. Objective evidence in the record of this case of Remark's actual operations persuades us that, if Remark had been successful, it would have derived more than 50 percent of its gross receipts from active sources. Prior to Remark's demise, it had operating assets, salaries, and sales commensurate with a startup company positioned to grow with the emerging video-lottery business. Remark had hired a marketing director to develop Remark's identity among State lottery commissioners and had provided several States with information and suggestions for development of laws regulating video-lottery machines. Remark had acquired the rights to several electronic gaming machines and related technologies, and it had become a licensed gaming machine manufacturer in Washington. Some of its equipment had been approved *435 by Montana and Nebraska, and one machine had been test marketed in Nebraska. Although Kramer had been acquired for the purpose of manufacturing Remark's video-lottery machines, Remark had separate warehouse and assembly facilities, in which it assembled electronic punch board games. During the fiscal year ended May 31, 1986, Remark generated $ 326,721 of gross receipts, and at the end of that year it held $ 229,687 of inventory. Unfortunately for petitioners, Remark's video-lottery business never emerged from its startup phase. However, if it had so emerged, Remark would have received a significant amount of its gross receipts from the sale and operation of video-lottery machines. Although we agree with respondent that Remark was organized to provide petitioners with the benefits of section 1244, we find that Remark was organized and operated in such fashion as to comply with its requirements. We have found that Remark was largely an operating company, and that petitioners are entitled to an ordinary loss under section 1244. Now, we must decide whether, when Remark's common stock was issued, petitioner obtained more than $ 50,000 of basis in it. (b) Ordinary Loss under Section *436 1244 -- Basis of Remark Stock
Petitioners assert that, in addition to the $ 50,000 paid to the former owners of Kramer, petitioner's basis in Remark's section 1244 stock includes the value of petitioner's pledge agreement to FNB. Petitioners assert that the pledge agreement had a value of $ 412,500 (the value of the pledged Delmed stock), or in the alternative, $ 56,000 (petitioner's basis in the pledged Delmed stock). [3] Petitioners cite no authority for their assertion that value equals basis. Respondent does not question that petitioner initially capitalized Remark with $ 50,000, but asserts that petitioner's section 1244 basis is limited to $ 50,000. We agree. Although petitioner's basis in his Remark stock could have increased *437 subsequent to its issuance, the basis allocable to section 1244 stock could not have increased subsequent to issuance unless additional shares were issued that themselves satisfied the statutory requirements. Sec. 1244(d)(1)(B). Therefore, without another stock issuance, petitioner's basis in Remark's section 1244 stock could not be more than his initial basis. Petitioner pledged 100,000 shares of his Delmed stock to secure FNB's loan to Remark. In doing so, petitioner created a security interest that provided assurance that, if Remark should default on FNB's loan, petitioner's 100,000 shares of Delmed could be used to satisfy the loan. When petitioner pledged his Delmed stock and Remark issued its stock, petitioner's pledge was an open transaction. Until petitioner either transferred the Delmed stock to Remark or otherwise satisfied his contingent obligation, the transaction remained open, and petitioner is not considered to have made an economic outlay that would result in additional basis in his Remark stock. See Harris v. United States, 902 F.2d 439, 445 (5th Cir. 1990); Estate of Leavitt v. Commissioner, 875 F.2d 420, 422-423 (4th Cir. 1989), *438 affg 90 T.C. 206 (1988); Battelstein v. IRS, 611 F.2d 1033, 1035 (5th Cir. 1980) (note promising payment is not a payment under section 163(a)) (citing Don E. Williams Co. v. Commissioner, 429 U.S. 569, 577-578 (1977)). Compare Town & Country Food Co. v. Commissioner, 51 T.C. 1049, 1056-1057 (1969) (pledge did not constitute sale or other disposition) with Mathers v. Commissioner, 57 T.C. 666, 674-675 (1972) ("pledged" notes were not "transferred merely as collateral security"). Because petitioner's pledge did not amount to an economic outlay at the time Remark issued its stock, the pledge could not increase petitioner's initial basis in his Remark stock. Goatcher v. United States, 944 F.2d 747, 751 (10th Cir. 1991) (quoting Harris v. United States, supra at 445); Estate of Leavitt v. Commissioner, supra at 423; see Siple v. Commissioner, 54 T.C. 1, 9 (1970) (payments made in lieu of transfer of pledged stock increased stock basis *439 and were allowed as losses in the years that payments were made). [4]
Even if petitioner's pledge were deemed to be a completed transaction, the basis of the Remark stock would "be the same as that of *440 the property exchanged". Sec. 358(a)(1). Because petitioner neither incurred any cost nor recognized any income with respect to the pledge, his pledge had no basis and could not increase the basis of the Remark stock received in exchange for it. Estate of Leavitt v. Commissioner, 90 T.C. 206, 212-213 (1988), affd. 875 F.2d 420 (4th Cir. 1989). Therefore, at the time the Remark common stock was issued, petitioner's basis in the Remark stock was $ 50,000, the amount paid directly to the former owners of Kramer. Even if petitioner's pledge were deemed to be a completed transaction that gave him basis in his Remark stock at the time of issuance, we would question whether the Remark stock issued in exchange for it would be section 1244 stock. Remark could not have issued section 1244 stock in exchange for the Delmed stock, sec. 1244(c)(1)(B), and petitioner's pledge was in essence a promise to contribute the same stock (if needed) in exchange for Remark stock. In any event, petitioner's pledge was not a completed transaction, and it could not create basis in his Remark stock at the time the stock was issued. Petitioners' loss under *441 section 1244 is therefore limited to $ 50,000. Issue 2. Advances to Kramer
Irrespective of whether petitioner's $ 400,000 of advances to Kramer resulted in bad debt losses or stock losses, they can be recognized in 1989 only if they became worthless in 1989. Secs. 165(g)(1) and 166(a). Worthlessness "'must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year of the asserted worthlessness.'" Halliburton Co. v. Commissioner, 93 T.C. 758, 774 (1989) (quoting Estate of Mann v. United States, 731 F.2d 267, 278 (5th Cir. 1984)), affd. 946 F.2d 395 (5th Cir. 1991). At the end of 1989, Kramer had filed for bankruptcy protection under chapter 11 of the Bankruptcy Code. However, the filing of a bankruptcy petition is not conclusive evidence of worthlessness, and the debtor's bankruptcy does not necessarily establish that its debts are worthless. Leon H. Perlin Co. v. Commissioner, T.C. Memo. 1993-79, remanded 47 F.3d 1165 (4th Cir. 1995). To be worthless, not only must the *442 advances "be lacking current liquid value and be uncollectible at the time the taxpayer takes the deduction, but also * * * [they] must be lacking any potential value and be uncollectible at any time in the future." Id. (citing Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972)). At the end of 1989, Kramer's bankruptcy case had not yet been converted to chapter 7, and petitioners did not present any evidence showing that Kramer was not expected to emerge from bankruptcy as a viable entity. More importantly, on December 31, 1989, petitioner appeared to hold perfected security interests in valuable assets. Petitioner's advances were secured by Kramer's right to receive payments arising from a District Court order and by Kramer's intangible assets. At the end of 1989, no other creditor appeared to have a superior security interest in those assets, and the assets appeared to be valuable. In April 1990, petitioners attempted to realize the potential value of these interests by filing a lawsuit to recover the assets. See Marine v. Commissioner, 92 T.C. 958, 980 (1989), *443 affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Although petitioners' lawsuit was ultimately unsuccessful, the facts and circumstances known on December 31, 1989, indicate that the advances had value at that time. Dawn v. Commissioner, 675 F.2d 1077, 1079 (9th Cir. 1982), affg. T.C. Memo. 1979-479; Marine v. Commissioner, supra at 980. Petitioner's advances to Kramer were not worthless as of December 31, 1989, and were, therefore, not deductible in 1989. Issue 3. Payment on Guarantee of NCB Delivery-Truck Loan[5]
Section 166(a) sets forth the general rule that a worthless debt is deductible in the year that it becomes worthless. Losses resulting from *444 guarantees may be bad debt losses because the guarantor steps into the shoes of the lender. Putnam v. Commissioner, 352 U.S. 82, 85-86 (1956). However, a bad debt loss is not allowed if, on the basis of all the facts and circumstances at the time a guarantee was entered into, the payment under the guarantee would be considered a shareholder's contribution to capital. Sec. 1.166 -9(c), Income Tax Regs. In addition, noncorporate taxpayers must treat the loss from a nonbusiness debt as a short-term capital loss, deductible only to the extent allowed by section 1211(b). Sec. 166(d)(1). For purposes of section 166(d)(1), a nonbusiness debt is "a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2). On August 18, 1989, NCB withdrew $ 2,584 from petitioners' account as a payment under petitioner's personal guarantee of the $ 37,000 delivery-truck loan to Kramer from NCB. For petitioner's payment to NCB to be deductible as a business bad debt in 1989, the payment must *445 not have been a contribution to capital, the guarantee must have been entered into primarily to protect petitioner's job, Generes v. Commissioner, 405 U.S. 93, 106 (1972), and he could not have had a reasonable chance of recovery as of December 31, 1989. It is undisputed that petitioner did not have any chance of recovering his payment under the guarantee as of December 31, 1989, because the debt resulting from his payment under the guarantee was unsecured. Respondent asserts that the $ 2,584 payment was a capital contribution to Remark because NCB looked for repayment to petitioner's assets, not Kramer's assets, so that the substance of petitioner's payment was a capital contribution to Remark, which then made a capital contribution to Kramer. However, the loan was secured primarily by a purchase money security interest in a delivery truck (Kramer's asset). In view of the adequacy of NCB's security interest in Kramer's asset, we find that the substance of petitioner's personal guarantee followed its form, and that payment under the guarantee created debt not equity. When payment under a guarantee is not a contribution to capital, the question "is *446 whether the guarantor's dominant motivation in executing his guarantee was to protect his salary or to protect his investment." B.B. Rider Corp. v. Commissioner, 725 F.2d 945, 949 (3d Cir. 1984), affg. in part on this issue and vacating and remanding in part on another issue T.C. Memo. 1982-98; Sussman v. Commissioner, T.C. Memo. 1980-228. "Significant motivation is not sufficient." Generes v. Commissioner, supra at 103. The question of motive relates to the time the guarantee was entered into, not the time the actual payment was made. Stoody v. Commissioner, 66 T.C. 710 (1976), vacated on another issue 67 T.C. 643 (1977). "The fact that a loan or payment is made in furtherance of the employer's trade or business does not mean it is proximately related to that of the employee." Benak v. Commissioner, 77 T.C. 1213, 1217 (1981); Shinefeld v. Commissioner, 65 T.C. 1092, 1098 (1976). When the employee is also a shareholder in the employer, it is *447 difficult to determine whether the motivation for loan is to protect his job or his investment. B.B. Rider Corp. v. Commissioner, supra at 948. "It must be clear from the record that the primary reason for making the advances which gave rise to the debts was business related rather than investment related". Smith v. Commissioner, 60 T.C. 316, 319 (1973). The dominant-motivation standard "provides a guideline of certainty for the trier of fact", who "then may compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." Generes v. Commissioner, supra, at 104. To decide whether the taxpayer's dominant motivation was to protect his salary or to protect his investment, we compare the taxpayer's salary, the value of his investment, and other motivating factors at the time he guaranteed the loan. Id. at 106; Putoma Corp. v. Commissioner, 66 T.C. 652, 674 n.32 (1976), affd. 601 F.2d 734 (5th Cir. 1979). Petitioners have not persuaded us that *448 petitioner guaranteed Kramer's $ 37,000 loan from NCB primarily to protect his job. Although the loan furthered Kramer's business, a comparison of the risks and rewards of the guarantee shows that petitioner's job with Kramer was not his primary concern. Petitioner had previously been instrumental in starting American Medical in an emerging market and helping it to become a success. Petitioner's primary reward for his efforts on behalf of American Medical had come not from increased salary but from his stock interests. Petitioner recognized the potential rewards of successful entrepreneurship. After he left American Medical, he went in search of another emerging market to attempt to repeat his success. We think that petitioner expected, if Remark had become a successful player in the video-lottery market, that his reward would be realized primarily through sale or other disposition of his stock interest in Remark, rather than his salary from Kramer. See Lease v. Commissioner, T.C. Memo. 1993-493. Petitioner's salary was dwarfed by his exposure to liabilities that would have resulted from Remark's or Kramer's inability to repay their loans. Even though *449 petitioner had set himself a salary of approximately $ 300,000 per year when he started with Kramer, in mid-1986, before guaranteeing the NCB delivery-truck loan, he cut his salary in half in order to relieve Kramer's cash-flow problems. On the other hand, petitioner's personal guarantees had already exposed him to over $ 1,595,000 of liabilities if Remark and Kramer should default on their bank loans, as indeed they did in due course. Although petitioner's payment under his personal guarantee of Kramer's $ 37,000 loan from NCB was not a contribution to capital, he did not enter the guarantee primarily to protect his salary, and the resulting loss on his partial satisfaction of the guarantee was a capital loss. Decision will be entered under Rule 155. Footnotes
1. Each State that legalizes video gambling has a licensing and regulatory commission to oversee video gambling within the State. At least one State required a background check that included detailed financial records and took 9 months to complete. The State lottery commissions also establish the technical requirements and payout schedules for the machines.↩
1. The record did not contain a trial balance, financial statement, or tax return for this period, and therefore, these amounts were not available.↩
2. Sec. 1244. LOSSES ON SMALL BUSINESS STOCK. (a) General Rule.--In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall,to the extent provided in this section, be treated as an ordinary loss. * * * * (c) Section 1244 Stock Defined.--
(1) In general.--For purposes of this section, the term "section 1244 stock" means stock in a domestic corporation if--
(A) at the time such stock is issued, such corporation was a small business corporation, (B) such stock was issued by such corporation for money or other property (other than stock and securities), and (C) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock was sustained, derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents,dividends, interests, annuities, and sales or exchanges of stocks or securities. (2) Rules for application of paragraph (1)(C).--
(A) Period taken into account with respect to new corporations.--For purposes of paragraph (1)(C), if the corporation has not been in existence for 5 taxable years ending before the date the loss on the stock was sustained, there shall be substituted for such 5-year period--
(i) the period of the corporation's taxable years ending before such date * * * * * * * (C) Nonapplication where deductions exceed gross income.--Paragraph (1)(C) shall not apply with respect to any corporation if, for the period taken into account for purposes of paragraph (1)(C), the amount of the deductions allowed by this chapter (other than by sections 172, 243, 244, and 245) exceeds the amount of gross income.
* * * * (d) Special Rules.-- (1) Limitations on amount of ordinary loss.-- * * * * (B) Increases in basis.--In computing the amount of the loss on stock for purposes of this section, any increase in the basis of such stock (through contributions to the capital of the corporation, or otherwise) shall be treated as allocable to stock which is not section 1244 stock.↩
3. We note that, although petitioners use petitioner's Delmed stock to calculate the asserted value of the pledge agreement, and therefore their asserted basis in Remark's sec. 1244 stock, any Remark stock issued in exchange for Delmed stock would not be sec. 1244 stock. Sec. 1244(c)(1)(B).↩
4. Petitioners did not argue that we should disregard the form of the original FNB loan to Remark and treat it as a loan to petitioner, who then contributed the proceeds to Remark, see Selfe v. United States, 778 F.2d 769 (11th Cir. 1985); Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182↩, and the evidence presented would not overcome the form that petitioner chose. However, if petitioner had borrowed the money and then contributed it to Remark, it appears that Remark would have received more than $ 1 million in exchange for its stock, so that Remark would not have been a small business corporation and its stock would not have been section 1244 stock. See sec. 1244(c)(1)(A), (3)(A).
5. Although petitioner had guaranteed well over $ 1 million of other Remark and Kramer debt, petitioner made no payments under his other guarantees, and the tax consequences of the other guarantees are not in issue in this case.↩